Philip HANDELMAN, Plaintiff,

v.

HUSTLER MAGAZINE, INC., and Larry C. Flynt and Kevin Cash, Defendants.

No. 77 CIV 3666 (LBS).

United States District Court, S. D. New York.

April 26, 1979.

See also D.C., 469 F.Supp. 1048.

Philip Handelman, New York City, pro se.

Jack N. Alpert, New York City, for defendants.

C. William Brownfield, Columbus, Ohio, Trial Counsel for Defs.

SAND, District Judge.

In our opinion filed on October 12, 1978[1] denying defendants' motion for summary judgment, we reviewed the background facts and governing legal principles applicable to this libel action. Familiarity with that decision will be assumed. This opinion constitutes our findings of fact and conclusions of law as required by F.R.Civ.P. 52(a).

---

1. Hereinafter, this opinion is referred to as the summary judgment opinion.

## FINDINGS OF FACT

### The Estate Proceedings

Katharine W. D. Loeb, mother of William Loeb ("Loeb"), publisher of the Manchester Union Leader and the New Hampshire Sunday News, died on November 24, 1966. Pursuant to the terms of her will, Loeb was disinherited and his daughter, i. e., the decedent's granddaughter, was the principal beneficiary of the estate which was valued at approximately one million dollars. Pursuant to the terms of the will, the Chase Manhattan Bank and Alexander C. Dick, who was associated with the plaintiff in the practice of law, served as Executors.

Loeb, through his counsel Rogers and Wells, instituted two proceedings: objections to the probate of the Will and an action to enforce a contract which would have given Loeb 75% of his mother's estate.

For his services on behalf of the Executors in both matters, plaintiff was paid the sum of $89,250.00.[2] The only other legal fees paid by the estate were payments of $30,000 to Clarence Meleney, the attorney who filed the will for probate, and $10,000 to Peter Allsopp, who had served as special guardian. Thus, the legal fees paid out of the estate totalled $129,250.00.

As is the case in all such proceedings, the Surrogate in Mineola, New York where the will was admitted to probate, was called upon to review and approve these fees and indeed, one charity named as a beneficiary objected to the size of the fees. After discussion with the Surrogate, plaintiff reduced a fee request from $25,000 to $11,250. This lower fee was approved by the Surrogate.

### The Book "Who the Hell is William Loeb?"

The defendant, Kevin Cash, a sometime free-lance writer and publisher from New Hampshire, had worked for Loeb in 1948–49 and again in 1957–1959. Cash testified that he was never on good terms with Loeb who at one time "suspended" him for one year, an action which Cash regarded as tantamount to dismissal.

Cash researched and wrote the book Who the Hell is William Loeb? which was published in 1975 by Amoskeag Press, Inc., a corporation formed by him for this purpose. The book devotes 50 pages to a description of the estate proceedings. Nowhere in the book does the figure $800,000 appear with reference to the amount of legal fees charged to the estate. The book does, however, contain the statement "well over half of the bulk of the estate went to legal fees". Defendant's Trial Exhibit A.

As part of his research on this section of the book, Cash reviewed the papers filed in the Surrogate's Court in Mineola and he interviewed the decedent's granddaughter, Mrs. McAllister. In his review of the voluminous files in the Surrogate's Court, Cash noted the protracted nature of the proceedings (six years) and the participation in the proceedings of many counsel and law firms, who might fairly be described as "high priced New York lawyers". He also saw the affidavit of Alexander C. Dick in which it is stated that plaintiff received $103,000. for his services to the estate.[3] These fees seemed quite high (especially from the perspective of a New Hampshire free-lance writer) and indeed, Cash compared them to the salary paid to a journalist for one assignment.

Cash, who lacks any legal training or sophistication, assumed that if plaintiff received approximately $100,000 for his services, the total legal fees must have been an

2. Throughout the proceedings, Handelman stated that his fees totaled $98,500. The record, however, indicates that the total fees were $89,250. Mr. Handelman testified, and offered the receipts in evidence, that he received fees of $20,000; $18,000; $15,000; $25,000; and $11,250. Record at 218, and plaintiff's Trial Exhibit 8. Handelman testified that the sum of these figures is $98,250. Defendants did not object to this arithmetic error.

3. This affidavit, filed in the proceeding challenging the reasonableness of trial counsel's fees, sets forth the background and details of the Loeb estate litigation. The affidavit indicates that the total fees paid Handelman were $103,000. This figure, however, does not reflect the reduction of the final fee from $25,000 to $11,250. See page 1054, supra.

amount approximately equal to $100,000 multiplied by six or seven, the number of lawyers he believed participated in the proceedings. He also assumed, erroneously and without any basis in fact insofar as the Surrogate's Court files disclosed, that all of the fees, *i. e.,* including the fees paid by Loeb to his counsel, were charged to the estate. He also appears to have assumed that the $92,000 payment to Loeb in settlement of the contract action was a sum which could be attributed to legal fees. There appears, however, to be no factual basis for this assumption.

Cash testified that Mrs. McAllister told him that the Will was fought for six years and the lawyers "ate up" about $700,000 of the estate. This statement by Mrs. McAllister is contained in Cash's contemporaneous notes of that interview. Trial Exhibit 7. It is noteworthy that the phrase "ate up" is attributed to Mrs. McAllister since the phrase "eat up" appears, as we shall see, in the alleged libel. As we shall also see, Cash testified that he neither wrote the alleged libel nor furnished Trial Exhibit 7 to anyone at Hustler. It may be that the use of the phrase is pure coincidence, being a rather common colloquial expression to describe the process of one thing consuming or depleting another.

In addition to the foregoing, Cash acquired from Mrs. McAllister the impression that she had retained an attorney to represent her personally, and that this attorney's fees also "ate" into the estate. This latter impression too was, of course, erroneous.

The information Cash received from Mrs. McAllister fortified his belief that legal fees charged to the estate were in the $700,000 range.

Loeb has a reputation for litigiousness and, sensitive to this, Cash procured the services of counsel to review the manuscript of his book from the standpoint of vulnerability to a defamation action.[4] He also kept the underlying documents he relied upon in the preparation of his manuscript and placed them in a vault in the same office building as is occupied by his attorneys.

### Who Wrote the Hustler Article?

The Complaint alleges that Cash wrote the article containing the alleged libel, using the pseudonym "Ben Steffens". See our summary judgment opinion, n. 2. Cash denies that he is the author of the article, although for these purposes this denial may turn upon the precise definition one accords the term "author".

Cash testified that in the spring of 1976 while in Manchester, New Hampshire, he was asked by one Mark Baker of Hustler Magazine whether he would write an article for Hustler. The rates offered were $2,500 if Cash wrote the article under his own name or $1,500 if the article appeared under a pseudonym.[5] Cash testified that he declined the offer but sent Baker a copy of his book at Baker's request.

■ Baker called Cash again and renewed the offer. Cash again declined but discussed with Baker possible alternative authors. The discussion eventually lead to one John Deacy. Thereafter, Cash furnished Deacy with a sketch of material which eventually appeared in the Loeb article. Cash testified, when called by plaintiff as an adverse witness, that in this material he never used the figure $800,000 with respect to the amount of legal fees charged to the estate. However, when asked by his own counsel[6] on the defendant's case

---

4. Cash and Loeb are, in fact, engaged in litigation. The precise nature of that litigation, as to which Cash testified that he is the plaintiff, does not appear from this record and, in any event, is not germane to this action.

5. Because of the explicit sexual content of Hustler, many writers prefer to use pseudonyms when writing for the magazine. See Plaintiff's Trial Exhibit 8 [Deposition of Larry Flynt] at 8.

6. Hustler and Cash were represented at trial by the same counsel. At one stage of the proceedings, this counsel expressed concern about a possible conflict of interest between Hustler and Cash. After further discussions, however, he elected to continue on behalf of both defendants, and Cash, fully apprised of the possible problems, elected to have him so continue.

At that time, Mr. Handelman tentatively indicated that he would have no objection to drop-

whether he typed the document transmitted to Hustler which contained the $800,000 figure, he testified, "Well, I may have". The fact of the matter is that Cash believed that these fees were in the $800,000 range and we find that he is the source of this information furnished to Hustler. Cash served as a research consultant on the article and received $1,000 for his time and efforts in connection with the article. For the purposes of this proceeding, we find him to be the "author" of the article including so much of the article as contains the figure "$800,000".

### Editorial Processing at Hustler

The prime document utilized at Hustler for preparation of the article was the document presumably received via Deacy which originated with Cash and which bore the notation at Hustler "Cash original".

At the Hustler offices, the principal task of verification of the article for accuracy and possible defamation fell to Vicki Lynn Scott. The article was also reviewed by Baker and by Hustler's attorney, Frank E. Pfaff.[7]

The sources consulted by Scott were the Cash book on Loeb, articles, newspapers, discussions with Cash and "basically . . everything that I could possibly check in this article". Record at 411.

In approving the passage containing the reference to $800,000 Scott relied on the passage in the Cash book which stated that "well over half of the bulk of the estate" went for legal fees, a reference which she interpreted to mean about $750,000 or $800,000. To her, the figure seemed accurate. She checked a number of other facts with Cash and was influenced by Cash's assurances to her that his attorneys had reviewed every part of the book for libel and that they were holding his supporting documents in a vault.

Scott did not personally verify the $800,000 by reference to the original Surrogate Court files. She believed the document she was working with originated with Cash. She later learned it had come through Deacy but whenever she discussed it with Cash, he seemed thoroughly familiar with it and she believed Cash to be its author.

The $800,000 figure seemed reasonable to her given the number of attorneys involved and the protracted nature of the proceedings, reference to which had also appeared in Time or Newsweek.

A number of changes were made by Scott and others at Hustler as a result of the review of the article from the standpoint of accuracy and possible defamation exposure.[8] The key sentence alleged by plaintiff to be defamatory remained unchanged, however, throughout all these revisions.

Counsel for Hustler, Frank E. Pfaff, testified that he found no problems with the crucial sentence. Based on his estate experience, such a figure for several lawyers engaged in litigation for six years did not seem extraordinary nor cause him to initiate any further inquiries.

### Deposition of Larry Flynt

Larry Flynt, publisher of Hustler and a defendant herein, was deposed on December 6, 1977 in this action. This was prior to the attempt on his life which left him seriously disabled. On January 31, 1979, plaintiff sought to compel his appearance at the trial. Defendants opposed this application and furnished medical evidence of his condition.

---

7. Scott testified that three other editors also reviewed the article: Jim Heinisch, Bruce David and Hugh Cavanaugh. Record at 406–07.

8. Of course, the concern was with possible defamation claims by Loeb, the focal point of the article. There was no express concern with respect to the unnamed and otherwise unidentified "high priced New York lawyers".

ping Cash from the case. However, when the Court invited such a motion, Handelman indicated that he wanted to wait until the end of the case. Record at 171–72. In his post-trial brief, Handelman suggests that this Court sua sponte dismiss as to Cash without costs to plaintiff. Were it not for the fact that we have limited our award to nominal damages, we would give serious consideration to this suggestion.

By Order dated February 13, 1979, this Court refused to compel Flynt's presence at the trial or to permit further depositions. It did, however, provide that plaintiff might serve interrogatories or requests to admit on Mr. Flynt. Plaintiff did not avail himself of this opportunity. He did, however, introduce Flynt's deposition into evidence.

Flynt testified that Cash wrote the Hustler article under the pen name "Ben Steffens". He also testified that, although he did not personally verify the article, he assumed that his staff did. Specifically, Flynt stated that he was told by Bruce David, his executor editor, that "more research will be done on this article than any other article ever before published in Hustler." Plaintiff's Exhibit 18 at 39.

*Impact on Plaintiff*

Plaintiff, appearing pro se in this action, described himself as one who practices nationally, generally as a barrister retained by other counsel to handle complex litigation.

He claims that the article has affected his personality because he does not believe that he enjoys the same respect that he had before and that he has suffered physical and mental injury from the article. Moreover, he claims his referrals have fallen off as a result of the article; that he has been compelled to curtail his staff sharply and that he will be compelled to terminate his office lease and "seek the umbrella" of an association with a large firm. He attributes none of this to his age (74) or to any circumstance other than the Hustler article.

Over objection by defendants that proof of special damages was impermissible in a case based on a *per se* tort, plaintiff called six attorney witnesses with respect to the impact of the article on plaintiff.

Morgan P. Ames, a member of the distinguished Connecticut law firm of Cummings and Lockwood, testified that he had known plaintiff socially since 1975, having participated in a long distance sailboat race with him. His knowledge of plaintiff's practice was based on what plaintiff told him, including the fact that plaintiff was involved

in the Loeb will contest. He formed the impression that plaintiff was a successful attorney and that he was bright, able, gregarious and happy. Subsequent to February, 1977, he observed a personality change in plaintiff. When he met plaintiff in February, 1978, he thought plaintiff to be depressed.

Mr. Ames was asked by a John Pirre to represent him in a litigation pending in the United States District Court for the Southern District of New York. Ames referred the matter to the plaintiff. In a later conversation between Ames and the plaintiff, Ames was told by the plaintiff that he had deliberately quoted a high retainer to Pirre to discourage him. Plaintiff told Ames that he believed that if Pirre had retained him, he would have had to tell Pirre about the Hustler article and tell Ames as well. Plaintiff later told Ames that this would have been embarrassing to him and hence, he utilized the ploy of quoting a high retainer to avoid such a disclosure.

Ames, who later read the Hustler article, which he interprets to imply that plaintiff was in collusion with Loeb, stated that the article affects his ability to refer other matters to plaintiff. He recounted one other matter involving some Virginia litigation in which plaintiff asked him to become involved. Ames declined. The reasons for this are not entirely clear; it appears that another partner at Ames' firm was a close friend of the attorney on the other side of the litigation. Ames never in fact had any professional dealings with plaintiff, other than as set forth above. Ames expressed his opinion as an attorney-expert who had experience in libel matters that the article in fact referred to plaintiff and that he and any other attorney would regard it as "defamatory and derogatory".

Ames testified on cross-examination, however, that he believed that the article's reference to "high priced lawyers" was defamatory. Plaintiff has stipulated that he does not so regard this reference. See summary judgment opinion n. 2. Ames' disdain for Hustler, which he describes as "this

distasteful magazine" was also obvious and would suggest that he would view any reference to an attorney appearing in Hustler to be professionally disadvantageous.

Plaintiff also called Eugene J. Keogh who has known plaintiff for over 53 years and who was successfully represented by plaintiff in Keogh's own libel action against the Estate of Drew Pearson.[9]

Mr. Keogh testified that he first saw the article more than a year ago when plaintiff showed it to him. Because he knew of plaintiff's involvement in the Loeb estate, he testified that he thought of him as the attorney referred to in the article. He had a general recollection of the article being discussed by lawyers. Although he has recently cut back on the extent of his personal practice, he testified that he would refer a matter to plaintiff if the occasion arose.

Sigmund L. Miller, a Bridgeport attorney, testified that he has known plaintiff for 25 years and knew that he represented the executors of William Loeb's mother's estate. He first learned of the article when he heard it being discussed by lawyers awaiting a calendar call in state court.

Insofar as the impact of the article on his ability to refer cases to plaintiff is concerned, Mr. Miller testified that he doesn't know the true facts. If the allegations in the article are untrue, he would have no compunction about referring a client to plaintiff but he would feel compelled to make full disclosure of the article to the client so that, if later the client believed that the fee charged was too high and later learned of the article, the client would not feel that he had been misled.

Over the years, Mr. Miller has referred some six to ten matters to plaintiff and plaintiff has sent matters to him. Mr. Mil-

ler testified that no matter how construed, the allegation that the legal fees charged to a $1,000,000 estate were $800,000 inures to plaintiff's detriment. One may infer either that plaintiff had permitted the fees to mount, i. e., that plaintiff milked the estate, or that plaintiff lacked the professional skills to curtail promptly, efficiently and with a minimum of expense the frivolous claims being asserted by Loeb. Either interpretation reflects adversely on plaintiff's practice of his profession.

Two other attorneys, William Schurtman and Herbert S. Meeker, testified to plaintiff's good professional reputation and the adverse impact of the article on an attorney's ability to refer matters to him.

*Other Events Possibly Affecting Plaintiff*

Defendants cross-examined plaintiff concerning two reported cases: *Handelman v. Peabody*, 285 App.Div. 689, 140 N.Y.S.2d 374 (1st Dept. 1955) and *Handelman v. Keehn*, N.Y.L.J. December 8, 1977, at 12, col. 2 (Sup.Ct.N.Y.Co.).[10] Both cases deal in part with the question whether plaintiff was guilty of overreaching by charging excessive fees.

Plaintiff testified that, although he would have felt compelled to disclose the Hustler article to any prospective client or referring attorney, he did not feel compelled to disclose the *Peabody* or *Keehn* decisions. He stated that one case was erroneously decided and that another was settled by paying his fee because his adversary realized that enlightened self-interest militated in favor of that action.

Given this background we are disturbed by the testimony concerning the conversation between Ames and Handelman with reference to the Pirre referral. A responsible attorney, in our opinion, would not seek

**9.** Keogh represented plaintiff in *Handelman v. Peabody*, 285 App.Div. 689, 140 N.Y.S.2d 374 (1st Dept. 1955). See discussion of this case on page 1058, *infra*.

**10.** At the trial, defendants cited both cases to the Court which took judicial notice of them. Record at 268. Although mentioned by neither party, the *Keehn* case was the subject of a

front page news article in the issue of the New York Law Journal which printed the opinion (December 8, 1977). This article, entitled "Legal Fee in Matrimonial Case Reduced by Half to $50,000", quotes extensively from the opinion of Justice Nusbaum and mentions Handelman by name.

to avoid representing a client by citing an extremely high retainer. If an attorney wants gracefully to avoid a matter, he need only claim other pressing engagements, possible conflicts, or any other excuse. Especially for one who, in his complaint (par. 10) expressed concern that the bar as a whole was unjustly accused of being "unethical and overreaching", it is incongruous to suppose that he would cite high fees to a client as a pretext.

When one adds to this even the suggestion that plaintiff on occasion sought to collect fees higher than good practice would allow, one finds it difficult to accept this testimony other than with a grain of salt.

We conclude that when plaintiff told Mr. Ames that he cited a fee to Pirre so high as to discourage the retainer in order to avoid the necessity of disclosure of the Hustler article, plaintiff was engaging in wishful thinking in the light of how the prospective client in fact reacted to the fee he quoted and also in the light of the needs of this litigation. We dwell upon this incident not only because of the insights which it affords as to plaintiff and his contentions but because it is the only specific instance offered by plaintiff of a loss of retainer because of the Hustler article.

## CONCLUSION

■ We find that the crucial sentence in the Hustler article referred to plaintiff. It was concededly false. We further find that it disparaged plaintiff in his profession in a manner which is libelous *per se*.

We believe that the defendant Cash was the "author" of the libel. We find, how-

ever, that he acted entirely in good faith and certainly without malice towards the plaintiff who he did not know and never met. We have traced in some detail how Cash fell into error. His focus and the focus of his attorneys was, of course, on William Loeb and the threat of a defamation action by Loeb, who was described in so derogatory a fashion. Although Cash was wrong in his conclusion as to the amount of fees charged to the estate, he did try to research the matter by resort to the original documents and was led astray in part by Mrs. McAllister.

Because we find that Cash did not act in a reckless fashion,[11] we find that no basis exists for assessing punitive damages against him.[12]

So, too, Hustler and Larry Flynt did not act irresponsibly. Hustler endeavored to verify much of the article and relied on assurances that material contained in the Cash book had been cleared by Cash's counsel for defamation. Hustler's own counsel also reviewed the article. We see no basis for asserting that Hustler or Larry Flynt acted either out of malice towards plaintiff or recklessly. Accordingly, we find no basis for assessing punitive damages against either Hustler or Larry Flynt.

This leaves the difficult question of compensatory damages. We believe that plaintiff has been libeled and that he sincerely resents the Hustler article. Part of that resentment stems from his obvious aversion toward Hustler. For example, he appears to have declined the suggestion that a retraction be published in Hustler because he believed that any further association with the magazine would do him more harm than

11. In *Gertz v. Robert Welsch, Inc.*, 418 U.S. 323, 349, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789 (1974), the Supreme Court held that "the States may not permit recovery [in libel actions] of presumed or punitive damages, at least where liability is not based on a showing of knowledge of falsity or reckless disregard for the truth."

12. The *ad damnum* clause of the amended complaint in this action seeks $750,000. The damages are not labeled as either compensatory or punitive. In paragraph ten of his complaint, the allegation is made that "[t]he statement of

alleged facts in said publication are false and malicious and libelous and made recklessly and carelessly and with the intent to libel the plaintiff as well as members of the legal profession at large as being unethical and overreaching". In his post-trial brief, plaintiff states that he is seeking compensatory and punitive damages. For the purposes of this opinion, we have assumed that plaintiff has properly pleaded his punitive damage claim. However, we find that there is no basis in the record for an award of punitive damages.

good.[13] Some of his witnesses, *e. g.,* Ames and Keogh, obviously viewed Hustler with disdain.

 But magazines with sexually explicit text and photographs of genitalia are a part of our contemporary scene. Successful candidates for the Presidency of the United States consent to interviews in magazines of the same genre as Hustler. We think that plaintiff is not entitled to damages merely because there is an oblique reference to him in a magazine which he believes to be in bad taste.

We think plaintiff grossly overstates the extent to which his reputation has been injured by the Hustler piece. It was plaintiff himself who called the article to the attention of several of his witnesses. Certainly, far more members of the bar might be expected to have read the official reporter and the New York Law Journal containing the *Peabody* and *Keehn* decisions than would have read Hustler and identified plaintiff as the lawyer with respect to whom the passing reference was directed.

We also discount plaintiff's claim that the Hustler article has caused him to become depressed and adversely affected his personality. Plaintiff is obviously greatly concerned about the diminution in his practice. As we have noted, however, we do not believe that the Hustler article can fairly be said to have caused this. We think that the *Keehn* decision, the death of his associate Meleney, the semi-retirement of one of his referring attorneys, Representative Keogh, and perhaps plaintiff's age are the significant factors which account for the decline of his practice.

 Because we conclude that plaintiff has not demonstrated that he has been damaged as a result of the libel,[14] we award plaintiff the sum of one dollar in compensatory damages. This award of nominal damages is consistent with the damages awarded by New York State courts in case where a plaintiff lawyer who was the victim of a statement that was libelous *per se* failed to demonstrate a compensable injury to his reputation. See *Zator v. Buchel,* 231 App. Div. 334, 247 N.Y.S. 686 (3d Dept. 1931); *Paris v. New York Times,* 170 Misc. 215, 9 N.Y.S.2d 689 (Sup.Ct.N.Y.Co.1939) *aff'd. mem.,* 259 App.Div. 1007, 21 N.Y.S.2d 512 (1st Dept. 1940); see generally *Kruglak v. Landre,* 23 A.D.2d 758, 258 N.Y.S.2d 550 (2d Dept. 1965).

Settle order on notice.

---

**13.** Since plaintiff's name did not appear in the Hustler article, he is doubtless correct that a retraction which named him, if the retraction were so worded, would not have been in his best interest.

**14.** We are mindful that the Supreme Court in *Gertz v. Robert Welch, Inc.,* 418 U.S. 353, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) stated that actual injury is not limited to out-of-pocket loss. We find, however, that there was no competent evidence to support a finding of impairment of reputation and standing in the community, personal humiliation and mental anguish and suffering.