Reverend Jerry **FALWELL**, Plaintiff,

v.

**PENTHOUSE INTERNATIONAL, LTD., Curtis Circulation Company, Andrew Duncan and Sasthi Brata, Defendants.**

Civ. A. No. 81–0023(L).

United States District Court,
W. D. Virginia,
Lynchburg Division.

Aug. 6, 1981.

Thomas L. Phillips, Kizer, Phillips & Petty, Lynchburg, Va., for plaintiff.

Norman Roy Grutman, Jeffrey H. Daichman, Grutman, Schafrann & Miller, New York City, Alexander W. Bell, Bell, Coward, Morrison & Spies, Lynchburg, Va., for defendants.

## MEMORANDUM OPINION

TURK, Chief Judge.

Plaintiff, Reverend Jerry Falwell is an evangelical fundamentalist minister whose activities, including broadcasting, are centered in Lynchburg, Virginia. Plaintiff's weekly sermons are heard nationwide and in Canada and the Caribbean, by millions of people. His activities are funded largely by contributions received from viewers and listeners.

Defendant Penthouse International, Ltd. is a corporation organized under the laws of a state other than the State of Virginia, with its principal place of business in a state other than the State of Virginia; defendant Curtis Circulation Company is a corporation organized under the laws of a state other than the State of Virginia, with its principal place of business in a state other than the State of Virginia; defendant Andrew Duncan resides in the State of California; defendant Sasthi Brata is a citizen of England. Duncan and Brata work as freelance journalists. Federal jurisdiction is conferred upon this court by virtue of 28 U.S.C. § 1332.

Plaintiff's complaint arises as a result of interviews conducted with plaintiff by defendants Duncan and Brata in March of 1980 and October of 1980. In March of 1981, the interviews with Reverend Falwell appeared in *Penthouse* Magazine, along with plaintiff's name and picture. Reverend Falwell now claims that the interview appeared without his consent and contrary to specific conditions given orally to defendants Brata and Duncan at the time of the interviews. Stated succinctly, Reverend Falwell does not approve of *Penthouse* Magazine. He contends that the appearance of the interview was inconsistent with his ministry.

Plaintiff filed a complaint in this court on January 30, 1981. He asked for and was granted a hearing before the court on that day. No prior notice was given to the defendant of that hearing. After the *ex parte* hearing, the court granted a temporary restraining order, enjoining the distribution of the March, 1981, issue of *Penthouse* Magazine until February 2, 1981. The defendant *Penthouse* may have learned of the temporary restraining order from news reports. The other defendants were never notified of the order. After a hearing on a preliminary injunction in open court with all parties present, this court dissolved the temporary restraining order on February 2, 1981. The case remains before the court based on plaintiff's claims for compensatory and punitive damages.

On March 3, 1981, defendants *Penthouse*, Curtis and Duncan filed a motion to dismiss or to quash service on the ground that they had not been properly served with process pursuant either to Rule 4 of the Federal Rules of Civil Procedure or § 8.01–329 of the Virginia Code, and filed a motion to dismiss on the ground that the complaint failed to state a claim upon which relief could be granted. While plaintiff has now filed an amended complaint, defendants persist in their motions.

Plaintiff's amended complaint explicitly pleads the following five counts:

(1) "False Light" invasion of privacy

(2) Infringement of plaintiff's common-law copyright

(3) Defamation

(4) Conspiracy to willfully injure another in his trade or profession

(5) Commercialization of plaintiff's personality.

The court will now proceed to consideration of plaintiff's allegations in the context of defendants' Rule 12(b)(6) motion.

### (1) *"False Light" Invasion of Privacy*

██  Plaintiff's claim for "false light" invasion of privacy must be dismissed as a matter of law. The courts of Virginia simply do not recognize such a common law cause of action. Indeed, Virginia recognizes no right of privacy other than that specifically conferred by Virginia Code § 8.01–40, a legislative enactment in derogation of the common law.

This fundamental proposition of Virginia law cannot be seriously disputed in view of this court's decision in *Evans v. Sturgill*, 430 F.Supp. 1209 (W.D.Va., 1977). The plaintiff in that case also alleged an invasion of privacy, and specifically complained that the defendants' conduct was "calculated to, and did, place the plaintiff in a false light in the public eye . . .," precisely the allegations raised by Reverend Falwell in this action. In *Evans*, this court dismissed the privacy count with the following analysis:

Several states, including Virginia, have passed statutes which are substantially similar to the New York statute. See *Chaplin v. National Broadcasting Co.*, 15 F.R.D. 134, 138 (S.D.N.Y.1953). The Vir-

ginia statute states that the use, for commercial purposes, of the name, portrait, or picture of any person without his or her consent is a misdemeanor. Va.Code Sect. 8–650 (1957 Repl.Vol.) The statute further provides for injunctive relief and damages against the party misusing the name, portrait, or picture. No Virginia case has been located which has construed this statute. Also, no Virginia case has been located which found a right of privacy existing outside of the statute. However, a federal district court has considered the Virginia statute and has given it the same strict construction which the New York courts have given the very similar New York statute. *Bernstein v. National Broadcasting Company*, 129 F.Supp. 817, 829 (Dist.Col.1955); *cert. denied* 352 U.S. 945, 77 S.Ct. 267, 1 L.Ed.2d 239 (1956). In that case, the plaintiff had sued NBC for presenting a television program in 1952 which was a fictionalized dramatization of the plaintiff's conviction for bank robbery in 1919 and his subsequent pardon. The district court analyzed the law of Virginia and the law of the District of Columbia and concluded that no right of privacy existed in Virginia outside of the statute, Va.Code Sec. 8–650. The court went on to find that the television program did not fall within the narrow language or purpose of the Code section.

The right of privacy has been discussed in a comparable manner by Professor Prosser:

> In one form of [sic] another, the right of privacy is by this time recognized and accepted in all but a very few jurisdictions. It is recognized in a limited form by the New York statute, and by similar acts adopted in Oklahoma Utah and Virginia.

W. Prosser, *The Law of Torts*, Sec. 117 at 802 (4th Ed. 1971). Prosser clearly places Virginia in the category with New York, evidently concurring in the judicial conclusion that the legislative adoption of a particular form of the right to privacy signaled an intent to limit the scope of that right to the specific language of the statute.

In the absence of guidance from the Supreme Court of Virginia, this court must rely on the conclusions of other federal courts, state courts, and commentators, as it attempts to interpret the intent of the legislature of Virginia in adopting section 8–650. Therefore, it is the conclusion of this court that no general right of privacy exists in the law of Virginia, except for the limited right conferred by Va.Code Sec. 8–650. Further, the acts complained of do not fall within the rather narrow purview of that statute . . . " *Id.* at 1212–13.

Any decision inconsistent with the holding of *Evans* would represent a radical departure from the law as it presently exists in Virginia. This count must, therefore be dismissed.

### (2) *Common-Law Copyright*

■ The existence of common law copyright protection for the spoken word has not been established by any court. From time to time, the courts have entertained actions based on a claim of common law copyright in which the medium of expression was the spoken word, but in each instance the courts have never recognized a proprietary interest where there was no tangible embodiment of the expression of an idea. Were this court to accept plaintiff's cause of action as legally cognizable, it would set an unprecedented departure from the state of the law as it presently exists. Such an extension of the doctrine of common law copyright would be novel and unwarranted.

Plaintiff's claim of copyright is not founded on any existing principle of law, nor is it even analagous to any of the circumstances which heretofore have been contemplated by the courts. Plaintiff's claim of copyright presupposes that every utterance he makes is a valuable property right. If this were true, the courts would be inundated with claims from celebrities and public figures all of whom may argue that their expressions should also be afforded the extraordinary protection of copyright. Such a result was never contemplat-

ed by the development of the law regarding common law copyright, and such a result would run counter to the firmly established constitutional guarantees of freedom of speech and of the press.

Plaintiff cannot seriously contend that each of his responses in the published interview setting forth his ideas and opinions is a product of his intellectual labors which should be recognized as a literary or even intellectual creation. There is nothing concrete which distinguishes his particular expression of his ideas from the ordinary. Although it is sometimes difficult to differentiate, the expression of ideas is a separate and distinct concept from that of the ideas themselves. As stated in Nimmer, *The Law of Copyright,* Vol. I, Sec. 2.02 at pp. 2–19 (1980):

> It is a fundamental precept of copyright that only the expression of ideas, and not the ideas themselves, are copyrightable.

However different or unique plaintiff's thoughts or opinions may be, the expression of those opinions or thoughts is too general and abstract to rise to the level of a literary or intellectual creation that may enjoy the protection of copyright. Although the general subject matter of the interview may have been outlined in the reporters' minds prior to their meeting with plaintiff, the actual dialogue, including the unprepared responses of plaintiff, was spontaneous and proceeded in a question and answer format. There is no defined segregation, either by design or by implication of any of plaintiff's expressions of his thoughts and opinions on the subjects discussed which would aid in identifying plaintiff's purported copyrighted material.

In the case at bar, plaintiff willfully and freely participated in the interview. An interview with members of the media is not a private conversation. Like a press conference, plaintiff in this action responded to questions in a spontaneous manner and not from a carefully prepared text or even from notes. Moreover, plaintiff was aware that his comments were not made in the context of a private conversation but rather were destined expressly for dissemination to the public. Plaintiff is free to pursue a breach of contract action against the journalists.

But he is trampling upon fundamental constitutional freedoms by seeking to convert what is essentially a private contractual dispute into a broad-based attack on these principles of freedom of speech and press which are essential to a free society.

Plaintiff's claim of common law copyright is not cognizable under the law. His allegations do not come within the narrow circumstances where a cause of action involving an oral expression can be sustained under a common law copyright theory. Plaintiff's claim under such theory must therefore be dismissed as legally insufficient.

### (3) Defamation

■ A cause of action for defamation is premised on two factors: first, that the publication is both false and derogatory by nature and, second, that a third party would believe such to be true of the plaintiff, thus injuring plaintiff's reputation within the community. Of course, the logical corollary is that truth is an absolute defense.

In the case at bar, the alleged facts do not support the allegation of false and actionable defamation. Plaintiff bases his claim solely on a foundation of innuendo.

■ The plaintiff, as an admitted public figure, must meet a more stringent burden of proof. Where the plaintiff in a defamation case is found to be a public figure, it is for the plaintiff to demonstrate "with convincing clarity" the falsity of the publication in order to prove that defendants acted with actual malice. In a succession of cases, the United States Supreme Court has delineated and refined the standards which must be applied in such cases. A line of cases beginning with *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) sets forth the premise that a public figure must prove that the media defendant in disseminating information acted with "knowledge that it was false or with reckless disregard, whether it was false or not." *Id.* at 279, 84 S.Ct. at 725.

■ In the instant case, plaintiff's allegations do not constitute a *prima facie* case of actual malice. Plaintiff has conceded that the account as published is accurate, truthful, and totally consistent with his statements at the time of the interviews. Both the journalists and *Penthouse* have thus been absolved from *knowingly publishing a falsehood* by plaintiff's own admission.

In short, inasmuch as it is uncontroverted that the material disseminated by the defendants was truthful, it is obvious that no viable claim of defamation has been stated. The court recognizes that plaintiff is upset as a result of the fact of the appearance rather than the substance of the interview article itself. While plaintiff may believe that the fact of the appearance may give rise to false implications as to his cooperation with the magazine, this circumstance, standing alone, simply does not support any claim of actual malice. Again, if plaintiff was harmed because of the fact of appearance, it was as a result of the violation of the oral conditions set by plaintiff at the time the interviews were conducted and not because of any inaccuracy in the manner in which plaintiff was explicitly depicted. If plaintiff should eventually prevail on a breach of contract theory, the true crux of controversy in the instant case, the degree of injury caused by the "implications" might be a relevant element of damages. However, the arguable existence of such "implications" does not present an independent basis for a defamation claim.

### (4) *Conspiracy to Willfully Injure Another In his Trade or Business*

■ Virginia Code §§ 18.2–499 and 18.2–500 provide a statutory scheme establishing criminal and civil remedies for persons injured in their trade, profession, or business by two or more other persons acting purposefully, willfully, and maliciously. Several courts have held that the civil remedies of these sections are applicable only when the malicious conduct is directed to one's business. *Federated Graphics Companies, Inc. v. Napotnik*, 424 F.Supp. 291 (E.D.Va., 1976); *Moore v. Allied Chemical Corporation*, 480 F.Supp. 364 (E.D.Va., 1979). Plaintiff alleges that the defendants con-

spired to obtain and publish the interview and that his fund raising activities have been adversely affected as a result of the publication. Consequently, he urges that he is entitled to recovery under Va.Code § 18.2–500.

It is with some reservation and regret that the court considers this claim, inasmuch as it necessarily equates business activity with the work of an outreach ministry. However, it is unnecessary to reach this distinction inasmuch as it appears that the claim is defective on its face. There is simply no basis at this time for the general allegation that any of the defendants conspired for the specific purpose of injuring the plaintiff. While plaintiff has alleged a factual scenario from which it might be inferred that *Penthouse* conspired with Duncan and Brata to obtain the interviews and/or publish the article in violation of the alleged interview conditions, plaintiff has alleged no facts or circumstances which even remotely suggest that defendants acted for any more sinister purpose than to sell magazines. Plaintiff's complaint in this regard sets forth nothing more than mere speculation. While there is always a thin line present in matters which concern a party's motivation, the court is of the opinion that this line must be rigorously observed when possible restriction of First Amendment activities is at stake. Reverend Falwell is undoubtedly sincere in his beliefs. However, the rules of procedure do not require a party to proceed based on nothing more than the opposing party's personal opinion.

While the court can only conclude that the allegations of this complaint do not state a viable claim under Virginia Code §§ 18.2–499 and 18.2–500, it should again be emphasized that plaintiff is not without redress assuming that the facts which have been alleged are subject to proof. Even absent the requisite malice and intent to injure required under the Virginia conspiracy statutes, plaintiff is entitled to recover if *Penthouse* and the writers conspired to obtain the interview, or if *Penthouse* caused the writers to violate the terms under which the interview was granted. How-

ever, as previously suggested, these are matters of contract and tortious interference which are not properly before the court.

### (5) Invasion of Privacy: Commercialization of Plaintiff's Personality

■ The only remedy available for an invasion of privacy in Virginia is statutory, [Va.Code § 8.01–40 (1950) as amended]. Virginia has never recognized a common law cause of action for invasion of privacy. Because the Virginia statute is in derogation of the common law, it must be strictly construed. Therefore, plaintiff must satisfy each of the statutory prerequisites, including the requirement that plaintiff's name or likeness be used for purposes of advertising or trade. The interview of Reverend Falwell does not, as a matter of law, qualify as a trade or advertising purpose under the statute. Therefore, plaintiff's invasion of privacy claim must also be dismissed.

Obviously, everything that appears in a magazine is placed with the intention of increasing sales. But if the "purposes of trade" requirement were to be so broadly construed, it would conflict with the limited legislative goal in enacting a statute that creates a cause of action which did not exist at common law. Such an unnecessarily broad construction would likewise intrude on important constitutional freedoms, which guarantee the uninhibited dissemination of ideas.

### Conclusion

Reverend Falwell has been the central focus of abiding public interest and concern, and he has aggressively nurtured the public spotlight to promote and disseminate his personal views to as wide an audience as possible. In this cause of action, plaintiff has advanced five different legal theories of recovery in an attempt to redress what is really his personal dissatisfaction with the particular magazine in which his interview was published. The mere fact that plaintiff may not approve of publications such as *Penthouse*, or may not desire *Penthouse* to discuss his activities or publish his spoken words, does not give rise to an action cogni-

zable under the law. The First Amendment freedoms of speech and press are too precious to be eroded or undermined by the likes and dislikes of persons who invite attention and publicity by their own voluntary actions.

While the court can only conclude that plaintiff's dissatisfaction does not translate to any of the legal theories set forth in the current complaint, this does not necessarily mean that plaintiff's dissatisfaction is not actionable. As the court has repeatedly noted, plaintiff has alleged facts and circumstances which suggest possible breach of contract and interference with contract. While the court must dismiss the complaint as currently constituted for failure to state a claim, the final order will provide for dismissal without prejudice as to any supplemental claims sounding in contract. The court notes that should it eventually prove necessary to determine the extent of harm, if any, suffered by plaintiff, many of the allegations advanced in the instant case may well prove relevant. Accordingly, the dismissal is also without prejudice to reconsideration of the claims in that context. An appropriate order will be entered this day.