**Kelly FALOONA and Brandon Faloona, by their next friend, Linda FREDRICKSON, Plaintiffs,**

v.

**HUSTLER MAGAZINE, INC., Defendant.**

**No. CA 3–79–0056–R.**

United States District Court, N.D. Texas, Dallas Division.

May 2, 1985.

Gregory L. Ceshker, Harold E. Vanberg, Jr., Dallas, Tex., for plaintiffs.

John Anderson, David Donaldson, Graves, Doherty, Hearon & Moody, Austin, Tex., for defendant.

## MEMORANDUM OPINION

BUCHMEYER, District Judge.

This right of privacy suit involves the publication of nude pictures of the plaintiffs in two issues of *Hustler*.

## 1. INTRODUCTION

The plaintiffs, Kelly and Brandon Faloona, are both minors. They are sister and brother, and were only seven and five when the nude photographs were made.[1] They are joined in this suit by their mother, Linda Fredrickson, as "their next friend" and guardian ad litem.[2] Together, the minor plaintiffs and their mother/next friend make the rather dramatic claim that this:

"... is potentially a landmark case and stands on the threshold of ushering in the formal announcement of a standard of care for *skin magazines desiring to use the photographs of nude children*, that standard being that they *must first obtain court approval. It cannot be left to parents since*, in the area of child pornography, *it is often the parent who sells the child into this sickness.* SICKNESS FOR SALE, p. 20; *Hustler*, September, 1977, pp. 85–86. Consequently,

if parental consent were enough, a large number of our children would be denied a remedy against those who would publish and exploit their photographs for profit." (emphasis added.)[3]

The nude pictures of the minor plaintiffs were—*with the consent of their mother/next friend, Linda Fredrickson* —first published in 1977, when Kelly was eleven and Brandon was nine. Although the nude photographs of the plaintiffs merely depicted the bodies and genitals of young children,[4] there were numerous other pictures and drawings in this publication which were sexually explicit and often erotic—bare breasts and nude bodies of attractive women, female genitalia, male sex organs (both erect and flacid), foreplay (fondling of breasts and genitals), intercourse between a male and female (both implicit and explicit), and various acts of oral sex by men and women (explicit fellatio and cunnilingus). There were also graphic pictures and drawings of group sex, male and female masturbation (including photographs of dildos and vibrators), other acts of sodomy (buggery, bestiality) and sadomasochism, homosexual conduct (lesbians, males, pederasty)—as well as numerous other pictures and drawings of nude children and adolescents (even some of small children and adolescent males and females engaged in sexual intercourse).[5]

---

1. Nude pictures of the plaintiffs were made on two separate occasions. The first time, Kelly was six and Brandon was four; the second time Kelly was seven and Brandon was five. The nude pictures were published in *Hustler* five years later, when Kelly was twelve and Brandon was ten. They are now seventeen and fifteen.

2. On January 17, 1979, this Court signed an order requested by the mother/next friend, Linda Fredrickson, which appointed her as guardian ad litem for the purpose of instituting this action for her two minor children (who were then twelve and ten).

3. Plaintiffs' Trial Brief, p. 12.

4. The nude pictures of the plaintiffs are *not* "child pornography" under *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 3358, 73 L.Ed.2d 1113 (1982), because they do not show the plaintiffs engaged in any sexual activity or in a lewd exhibition of their genitals.

5. A motion picture containing similar sexual activities by adults resulted in these comments by the Chief Justice of the Utah Supreme Court: "A more sickening, disgusting, depraved showing cannot be imagined. However, certain justices of the Supreme Court of the United States have said that before a matter can be held to be obscene, it must [one that] '... when taken as a whole, lacks serious literary, artistic, political, or scientific value. Some state judges, acting the part of sycophants, echo that doctrine. *It would appear that such an argument ought to be advanced by depraved, mentally-deficient, mind-warped queers.* Judges who seek to find technical excuses to permit such pictures to be shown under the pretense of finding some intrinsic value to it are reminiscent of a dog that returns to his vomit in search of some morsel in the filth which may have some redeeming value to his own taste. *If those judges have not the good sense and decency to resign from their positions as judges, they should be removed either by im-*

However, the plaintiffs *do not* object to this 1977 publication, and they *do not* claim that their mother/next friend "sold them into the sickness of child pornography" because their nude pictures appear in it. To the contrary, both the minor plaintiffs and their mother/next friend are very proud of their nude pictures in this 1977 publication—*The Sex Atlas*—which they admire and which they consider to be a serious and comprehensive educational text on human sexuality published by The Seabury Press in conjunction with The National Sex Forum.[6]  (L. Fredrickson Dep., vol. II at 36, 64).

Indeed, the mother/next friend, Linda Fredrickson, was employed at one time by The National Sex Forum. As a photographer, she even took some of the nude pictures which appear in *The Sex Atlas* (including those of two naked adolescents). And, before the nude pictures of the plaintiffs were taken, the mother/next friend executed a release giving the photographer, who was head of the audio-visual department at The National Sex Forum, "all rights" in the photos and the permission for him to use them in any manner he saw fit [7]—and the photographer, in turn, signed an agreement authorizing The National Sex

Forum to use the nude pictures of the plaintiffs (and others) both in *The Sex Atlas* and "in connection with the sale and promotion of the book."

Sales of *The Sex Atlas* were, in fact, promoted in 1978—*with the approval of The National Sex Forum*—by a preview and book review which appeared in the November issue of *Hustler* and by a long excerpt ("Children, Sex and Society") printed in the December *Hustler*. A nude picture of both the minor plaintiffs *and their mother/next friend* was in the November 1978 issue with the book review; nude photographs of the plaintiffs appeared in the December 1978 *Hustler*. The nude pictures of the plaintiffs in the two *Hustler* issues are identical to the nude pictures of them which appeared—with parental consent, and without any present objection—in *The Sex Atlas* in 1977.[8]

■ However, *Hustler* is a "hard-core" men's magazine, not a serious or educational study of sexuality like the *The Sex Atlas*. And it is offensive; it is controversial; and *it is just plain raunchy.*[9]  Therefore, although the nude pictures of the plaintiffs in *Hustler* merely depict their bodies and genitals as young children,[10] there were

---

*peachment or by the vote of the decent people of their constituency.'"  Salt Lake City v. Piepenburg,* 571 P.2d 1299, 1303 (Utah 1977) (emphasis added).

**6.** In 1978, after *The Sex Atlas* was published, the name of The National Sex Forum was changed to "The Institute for Advanced Study of Human Sexuality."

**7.** The plaintiffs *do not* claim that this release, and the parental consent by their mother/next friend for the publication of the nude pictures in *The Sex Atlas,* was invalid because there was no judicial approval of it.

**8.** And, as discussed below, in another publication—*Meditations on the Gift of Sexuality*—which was also published in conjunction with The National Sex Forum.

**9.** *Hustler* has been described as "a coarse and sex-centered magazine." *Wood v. Hustler Magazine, Inc.,* 736 F.2d 1084 (5th Cir.1984). Its companion magazine, *Chic,* has been described as "a glossy, oversized, hard-core men's magazine." *Braun v. Flynt,* 726 F.2d 245 (5th Cir. 1984). The writing style of *Hustler* is juvenile,

its articles and fiction are at the level of a tabloid newspaper, and the photos of nudes in *Hustler* are much more explicit, sleazy and sadistic than those in *Playboy* or *Penthouse.*  (See *Def. Exh. 16*).

**10.** The plaintiffs, relying on *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), insist that Hustler's use of their nude photographs constitutes "child pornography." Although one court has convicted Hustler's publisher, Larry Flynt, of distributing obscene materials—*see Flynt v. The State,* 153 Ga.App. 232, 264 S.E.2d 669, *cert. denied,* 449 U.S. 888, 101 S.Ct. 245, 66 L.Ed.2d 114 (1980)—the present case *does not* involve child pornography. In *Ferber,* the Supreme Court stated:

"There are, of course, limits on the category of child pornography which, like obscenity, is unprotected by the First Amendment.... Here the nature of the harm to be combatted requires that the state offense be limited to works that *visually* depict sexual conduct by children below a specified age....

"We note that the distribution of descriptions or other depictions of sexual conduct,

numerous other photographs and drawings in the two *Hustler* issues which were sexually explicit (but not often erotic)—bare breasts and nude bodies of women (sometimes attractive), female genitalia, male sex organs (only flacid, not erect), foreplay (explicit fondling of breasts, implicit fondling of genitals), and various acts of oral sex, sodomy and sado-masochism (implicit fellatio and cunninlingus, buggery, bestiality).[11] However, unlike *The Sex Atlas*, the two issues of *Hustler* contain no photos or drawings of adolescents or children engaging in sexual intercourse—although they certainly contain much other material (profanity, violence, scatology, etc.) which is blatantly offensive.[12]

The plaintiffs and their mother/next friend are disgusted by this offensive and sexually explicit material in *Hustler;*[13] therefore, they object to the publication of the nude pictures of the plaintiffs in the November and December 1978 issues of *Hustler.* However, there is no objection to the plaintiffs' nude pictures themselves— since these are identical to the ones in *The Sex Atlas*—nor is there any objection to the written content of the book review in the November 1978 issue or *The Sex Atlas* excerpt in the December 1978 *Hustler.* And, despite their rather dramatic claims (quoted above), the minor plaintiffs do not really assert that their mother/next friend "sold them into the sickness of child pornography" because their nude pictures appear in *Hustler.*[14]

*Instead, the plaintiffs object to Hustler itself.* That magazine is tasteless; it is offensive; it is raunchy; it is filled with smut and sleaze and slime; and it is devoted primarily to sexual exploitation and disparagement of women. Therefore, the

not otherwise obscene, which do not involve live performance or photographic or other visual reproduction of live performances, retains First Amendment protection...." (102 S.Ct. at 3358)."
Here, the nude pictures *do not* show the plaintiffs engaged in any sexual conduct or performing any sexual activity. Accordingly, neither the publication of the plaintiff's nude pictures in *Hustler* nor their publication in *The Sex Atlas* constitutes child pornography, as defined by *Ferber.* See footnotes 4 and 11.

11. A book which described similar sexual activities resulted in these observations by Judge Curtis Bok of Pennsylvania, who was just as concerned about pornography as the Utah judge (see footnote 5) in *Piepenburg:* "It will be asked whether one would care to have one's young daughter read these books.... I should prefer that my own three daughters meet the facts of life and the literature of the world in my library than behind a neighbor's barn, for I can face the adversary there directly. If the young ladies are appalled by what they read, they can close the book at the bottom of page one; if they read further, they will learn what is in the world and its people, and no parents who have been discerning with their children need fear the outcome.... Our daughters must live in the world and decide what sort of women they are to be, and we should be willing to prefer their deliberate and informed choice of decency rather than an innocence that continues to spring from ignorance. If that choice be made in the open sunlight, it is more apt than when made in shadow to fall on the side of honorable behavior." *Commonwealth v. Gordon,* 66 Pa.D. & C. 101 (1949), quoted in *United States v. Roth,* 237

F.2d 796, 813–14 at footnote 34 (2d Cir.1956) (Frank, concurring), affirmed, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

12. Moreover, unlike *The Sex Atlas,* the two *Hustler* issues did not contain graphic pictures and drawings (i) of group sex (with the exception of a single photo in a movie review), (ii) of male and female masturbation (although there are advertisements for vibrators), or (iii) homosexual conduct by males (only lesbian sexual activity is depicted).

13. Obviously, there are many persons who would be equally offended by the sexually explicit and graphic material in *The Sex Atlas* —which are catalogued above simply to show how its contents compare to the two *Hustler* issues—and who, unlike the plaintiffs and their mother/next friend, would not consider *The Sex Atlas* to be a serious medical or scientific publication in which nude pictures of children and adolescents could properly appear. See *Ferber,* 102 S.Ct. at 3365. Compare footnotes 5 and 11.

14. At least the mother/next friend, Linda Fredrickson, has not been subjected to either state or federal criminal charges (i) under Texas Penal Code § 43.25(b), which prohibits parents from permitting their children to engage in a "sexual performance" for any photograph, play or motion picture, or (ii) under 18 U.S.C. § 2252, which prevents parents from allowing their children to engage in "sexually explicit conduct for the purpose of producing any visual or print medium depicting such conduct."

plaintiffs contend that, by publishing their nude photographs in the November and December 1978 issues, Hustler invaded their right to privacy by:

(i) placing the plaintiffs in a false light by intimating that they approved of and participated in the acts and lifestyle depicted throughout *Hustler;*

(ii) the public disclosure of embarrassing private facts about the plaintiffs; and

(iii) misappropriating the plaintiffs' images for Hustler's commercial advantage.

To support these claims, the plaintiffs and their mother/next friend advance two novel positions. *First,* they claim that, prior to its publication of any photograph of a nude minor, a "skin magazine" has a duty to obtain judicial consent or to make certain that there is a court order permitting the use of nude pictures of the minor in the "skin magazine." Second, the plaintiffs contend that they may permit their nude photographs to appear in one public context, while prohibiting publication of them in another.

Both of these propositions are baseless. The release executed by the mother/next friend for the publication of the nude pictures of her minor children, the plaintiffs, was valid; [15] no judicial approval was required. The publication of the nude pictures of the plaintiffs in the book review and *The Sex Atlas* excerpt in *Hustler* was

protected by this release and the photographer's agreement with The National Sex Forum. Moreover, the publication of these nude pictures did not improperly disclose private facts about the plaintiffs, put them in a "false light," or appropriate their images for *Hustler's* commercial advantage.

For these reasons and the others discussed below—and because there are no genuine issues of any material facts—the motion for summary judgment of the defendant, Hustler Magazine, is GRANTED and the plaintiffs' motion for summary judgment is DENIED.[16]

## 2. FACTUAL BACKGROUND

### a. The Plaintiffs and Their Mother Next Friend

While they were attending the University of Florida in Gainesville, Linda Fredrickson married Gerald Faloona. She earned a Bachelor of Science in Nursing, specializing in pediatrics, diabetes, and research. He graduated with a Ph.D. in Biochemistry. (LF, vol. I at 7–12).[17]

While they were still living in Gainesville, their first child—Kelly Faloona—was born on June 16, 1966. Shortly thereafter, the family moved to Dallas, where Dr. Faloona accepted a teaching position at Bishop College, and Linda Fredrickson Faloona continued her nursing career. On March 27, 1968, their second child—Brandon Fa-

**15.** For this reason alone, both of the two recent Fifth Circuit cases involving *Hustler* and its publisher, Larry Flynt, are distinguishable. In *Woods v. Hustler Magazine, Inc.,* 736 F.2d 1084 (5th Cir.1984), the consent form was forged by the persons who stole the nude picture of La-Juan Wood, and *Hustler* was negligent in verifying the accuracy of that form before publishing the photo in the "Beaver Hunt" section of the magazine. In *Braun v. Flynt,* 726 F.2d 245 (5th Cir.1984), an employee of *Chic,* a companion magazine to *Hustler,* fraudulently obtained consent to publish the picture from Mrs. Braun's employer, Aquarena Springs, by representing that *Chic* was a "fashion magazine" which had the "same clientele that would read a *Redbook* or *McCalls.*"

**16.** The summary judgment record consists of all pleadings, depositions, and answers to interrog-

atories and requests for admissions. Rule 56(c), Fed.R.Civ.P. It also consists of all trial exhibits filed pursuant to the Pretrial Order; the parties stipulated the authenticity of these exhibits, and this Court will consider them to the extent they would be admissible at trial. (All of the exhibits mentioned in this opinion except two—Court's Exh. 1 and Pl. Exh. 12—are also exhibits to the depositions.) However, some of the exhibits— such as the *Affidavit of Neil Adelman* attached to the Defendant's Supplemental Memorandum (August 18, 1983)—*are clearly hearsay and are inadmissible;* accordingly, they have not been considered in any way by this Court.

**17.** The depositions of Linda Fredrickson, Kelly Faloona, and Brandon Faloona will be cited as "LF," "KF," and "BF." Exhibits will be cited as "Pl. Exh. ___" or "Def. Exh. ___."

loona—was born in Dallas. (LF, vol. I at 7–9).

Sometime during 1971, the Faloonas separated. The children and their mother moved to San Francisco; the father remained in Dallas, where he has lived ever since. (LF, vol. I at 68). A California court granted the Faloonas a final divorce on December 27, 1971, awarding the mother, Linda Fredrickson, the "care, custody, and control" of both Kelly and Brandon, subject to the father's reasonable visitation rights. (Def. Exh. 1). At this time, Linda Fredrickson resumed her maiden name. (LF, vol. I at 3). Kelly was then five, and Brandon was three.

### b. San Francisco: 1971–1977

When she and the children arrived in San Francisco in 1971,[18] Linda Fredrickson accepted a position as a Registered Nurse at St. Mary's Hospital, a psychiatric care facility. In September of 1972, she attended a ten-day course in "sexual attitude restructure" at the National Sex Forum. Although she originally attended this course to advance her nursing career, Linda Fredrickson became so interested in the work of the National Sex Forum that—in January of 1973—she resigned from St. Mary's to accept a full-time position as an Educa-

tional Director at the Sex Forum. (LF, vol. I at 35).

As part of her new job, Linda Fredrickson conducted tours, arranged group programs for college students, and lectured on "Human Sexuality Through the Ages." She also helped to produce several educational films for the Institute.[19] During her courses and work at The National Sex Forum, Linda Fredrickson met and worked with (i) *Dr. Laird Sutton,* a photographer and head of the audio-visual department; (ii) *Dr. Ted McIlvenna,* a psychologist and Executive Director of The Sex Forum; and (iii) *Dr. Ervin J. Haeberle,* a sexologist who was then researching and writing *The Sex Atlas.* (LF, vol. I at 35–38).

After working for The Sex Forum for 1½ years, Linda Fredrickson left to pursue her film-making interests on a full-time basis at the San Francisco Art Institute. She received a scholarship, but to support herself and the children, she also returned to her position as a Registered Nurse at St. Mary's Hospital. In May of 1977, Linda Fredrickson received a Masters in Fine Arts (Film Making); and, in December of that year, she returned to Dallas. (LF, vol. I at 41, 59, 69, 70, 76, 108–110).

Under an oral agreement between their parents, the plaintiffs lived with their father in Dallas during the entire 1975 and 1977 school years (and during summer vacations in the other years). (*Id.* at 109–10, 113). In 1976, the plaintiffs and their mother/next friend lived in another two-bedroom apartment in San Francisco. In 1977, the plaintiffs returned to Dallas to live with their father. Linda Fredrickson moved back to Dallas in December of 1977 (*id.* at 113) and, apparently for some period, shared a house with the plaintiffs' father, Rose Sullivan, Vivian Dent, and Glen and Mary Crow. (*Id.* at 114–15).

**18.** The minor plaintiffs and their mother/next friend moved frequently during the period they lived in San Francisco. Upon arriving in 1971, they moved into a house with Norman Riffe, Robert Krause, and Susan Kreager. (LF, vol. I at 15–17). Linda Fredrickson refused (on advice of counsel) to answer whether or not she was "romantically involved" with Riffe, a journalist-film producer-roller rink operator, who had also moved to San Francisco from Dallas in 1971. (*Id.* at 15–21). She described their living arrangements in the house as "not a commune," but "cooperative living." (*Id.* at 28–29).

Approximately one year later, Norman Riffe moved to a farm in the country and Linda Fredrickson rented a two-bedroom apartment for her and the two children. (*Id.* at 27). In 1973 and 1974, the plaintiffs, their mother, Norman Riffe and Hilton Braithwaite lived together in a rented house. (*Id.* at 28–30). One year later, the plaintiffs and their mother/next friend moved again, this time to a house with Tina Lunde, Joe Van Whitson and Nessa Munter. (*Id.* at 30–3). Apparently, Norman Riffe returned to Dallas at that time. (*Id.* at 21).

**19.** One film concerned how paraplegics deal with their sexuality. (LF, vol. I at 59–60, 62). Another was an educational film depicting nude adults engaged in various sexual acts. Other films which Linda Fredrickson showed in the classes, or viewed while working at The National Sex Forum, depicted heterosexual intercourse, oral sex, and homosexual intercourse, but only in a "loving, caring" manner. (*Id.* at 43–44).

### c. Nude Photographs of the Plaintiffs

In 1972, Dr. Erwin Haeberle, a sexologist associated with The National Sex Forum, began work on *The Sex Atlas,* which was intended to be a comprehensive educational text on human sexuality. In September of 1972, Dr. Laird Sutton, the photographer—who had met Linda Fredrickson when she attended the ten-day sexual attitude re-structure course taught by Dr. Ted McIl-venna—asked if she and her children would pose for nude photographs to be used in *The Sex Atlas.* Linda Fredrickson dis-cussed this with the children, and with their father, Gerald Faloona, and then agreed. (LF, vol. I at 82; BF at 23). Sut-ton took the first set of photographs at the studio in his home in the fall of 1972. The plaintiffs were then six and four. Linda Fredrickson received $100 for that set of photographs, but the National Sex Forum never used them. (LF, vol. I at 78–84).

About a year later in 1973, Sutton again photographed the plaintiffs and their moth-er.[20] Kelly was then seven and Brandon was five. Although the National Sex Fo-rum did not pay any money for this second set, Linda Fredrickson was given several copies of the nude photographs. (LF, vol. I at 86, 93–94). She gave the children's fa-ther one photograph—a nude frontal view of the mother holding both children in her arms—and he hung it above the desk in his bedroom (*Id.* at 87–88, 106–07). Linda Fre-drickson displayed one of the nude pictures of her and the plaintiffs on their kitchen wall. (*Id.* at 97–98, 108; BF at 30–31). Both photographs were in full view of any-one visiting in the respective homes. (*Id.* at 107–09).

On August 2, 1973,[21] Linda Fredrickson executed two "Photographic Release Forms" for Dr. Laird Sutton. (Def. Exhs.

2, 3). One form was for her, the other was for the two minor children. The Forms are identical and they provide:

"That ... the undersigned was employed to participate and/or act in a photograph-ic representation photographed by Laird Sutton and for which the undersigned has received just compensation.

"That one of the terms of employment was that *the employer [Sutton] was free to use the photographs in any manner employer deemed fit,* whether by sale to the general public, sale to a limited audi-ence, or no sale at all.

"That *the employer [Sutton] has made no representation to the undersigned as to distribution of the photographic representation,* or any use employer may make of said representation.

"That *the undersigned retains no rights whatsoever* to the photographic represen-tation or to the literary or artistic prod-uct in which the photographic representa-tion is an integral part, and hereby, for a valuable consideration, releases and in-demnifies the employer from and against any and all claims the undersigned may make in the future against employer or employers assigns resulting from said employment." (emphasis added).

Linda Fredrickson read the release forms before signing them, and she understood the provisions. Although she believed the photographs were only to be used in *The Sex Atlas,* she knows the forms did not state this before she signed them.[22] More-over, she does not contend that Dr. Laird Sutton defrauded her in any way or tricked her into signing the releases. (LF, vol. I at 131–34.).

### d. The Sex Atlas

In November of 1972, Dr. Laird Sutton entered into a written Agreement with Dr.

---

**20.** On both occasions, Sutton shot four rolls of black and white film. Both sets included nude frontal poses of the two children separately, together, and with their mother/next friend, Linda Fredrickson.

**21.** The release signed by Linda Fredrickson for herself bears the date August 2, 1972, while the one she signed for the plaintiffs is dated August 2, 1973. However, she testified that 1973 was

the correct date for both releases. (LF, vol. I at 131–33).

**22.** Accordingly, any claim by the plaintiffs or their mother/next friend that there was some oral representation by Sutton, *before the release was signed,* that publication of the nude pictures would be limited to *The Sex Atlas* is precluded by the parol evidence rule. (LF, vol. III at 13).

Erwin Haeberle and The National Sex Forum which provided that, in return for payment of $5,000 "as a flat and final fee," Sutton (i) granted The National Sex Forum the exclusive right to use 100 photographs in *The Sex Atlas*,[23] (ii) represented that these photographs did not violate the right of privacy of anyone and that he was their sole owner, and (iii) provided that Dr. Haeberle and the Forum were entitled to use the photographs only in *The Sex Atlas* and *"in conjunction with the sale and promotion of the book."* (Def. Exh. 10) (emphasis added).

In 1976, while employed by The National Sex Forum, Linda Fredrickson began taking photographs for use in *The Sex Atlas*, including frontal shots of nude adults and children. (LF, vol. I at 126–31). On March 1, 1976, in return for a $450 payment for nine nude pictures, she executed an Agreement with Dr. Haeberle and the Forum which was identical to the one executed by Sutton. (Def. Exh. 11). In May of 1976, Linda Fredrickson drafted a release form covering nude photographs that she had taken of a minor; that form specifically limited use of the photographs to *The Sex Atlas*. (Def. Exh. 4; *Id.* at 130–31). The minor's father signed the release on his son's behalf.[24]

In 1977, *The Sex Atlas* (Pl. Exh. 3) was published by The Seabury Press, which had purchased the rights from Dr. Haeberle and The National Sex Forum. (Def. Exhs. 20, 21). The plaintiffs were then eleven and nine. Nude photographs of them, taken when they were seven and five, appear at pages 12, 13, 142, 154 and 155. Nude pictures taken by Linda Fredrickson appear on pages 14 and 15 (adolescent male and female), 17, 18, 19, 150 and 162 (genitals of adolescent male and female). (See *The Sex Atlas*, Pl. Exh. 3).

The plaintiffs and their mother/next friend admired *The Sex Atlas;* they were proud of it and the nude pictures. They went to a nearby bookstore in Dallas to see it. (BF at 17–18). Although they did not purchase a copy at that time, they later acquired *The Sex Atlas* and displayed it prominently in their living room. In fact, Kelly and Brandon routinely showed their nude pictures in *The Sex Atlas* to friends visiting in their home. (LF, vol. II at 46; KF at 16–17, 20).

**e. Meditations on the Gift of Sexuality**

In 1977, a book prepared by Dr. Ted McIlvenna (text) and Dr. Laird Sutton (photographs)—*Meditations on the Gift of Sexuality*[25]—was published by Specific Press in conjunction with The National Sex Forum.[26] On page 61, this book contained a nude photograph of both the plaintiffs and their mother/next friend. Before this picture was used, Dr. Sutton had called Linda Fredrickson, supposedly to obtain a "telephone release" from her for this particular photograph, which had not been used in *The Sex Atlas*. (LF, vol. III at 15–18). Later, Linda Fredrickson learned that she had been mistaken about which picture was to be used in *Meditations*—during the call from Sutton she thought it was the same nude picture of her and the children which was displayed above the father's desk—and she called Dr. McIlvenna to discuss this. (*Id.* at 15–17).

---

**23.** At that time, the tentative title of Dr. Haeberle's book was "The Love and Sex Book." (Def. Exh. 10).

**24.** Contrary to her position as "next friend" in this case, Linda Fredrickson did not seek any court approval of this release—but acted as if the father had the legal authority to sign a valid release on behalf of his son.

**25.** *Meditations* describes the interplay of religion and human sexuality. The text includes numerous biblical quotations and is illustrated by photographs of nude adults engaged in various sexual acts, including masturbation, heterosexual intercourse, homosexual intercourse, group sex, and oral sex. (*See* LF, vol. III at 16–17, 29.) *Both McIlvenna and Sutton, in addition to their Ph.D's, were Methodist ministers.* (LF, vol. I at 35–36, 48–49; LF, vol. III at 18). At the Court's request, the parties supplied a copy of *Meditations;* it appears in the record as Court's Exh. 1.

**26.** Specific Press was located in the offices of The National Sex Forum. (LF, vol. III at 32).

Dr. McIlvenna was not available, so Linda Fredrickson merely told his secretary that the National Sex Forum should not use any of their photographs again without first contacting her. She also told the secretary that she was moving to Dallas and could be reached there. However, Linda Fredrickson did not confirm her protest in writing—or file a lawsuit against either Sutton, McIlvenna, the Forum, or Specific Press. (LF, vol. I at 102–03; LF, vol. III, at 14–20, 31–34). Indeed, although Linda Fredrickson has not read *Meditations*, and although she has some concern about its emphasis on group sex, she has no real objections to the book—and still believes, as she did in San Francisco, that Dr. McIlvenna's premise for *Meditations* is correct: that "in order for people to be in touch with God, they have to be in touch with their own sexuality." (LF, vol. I at 48–49; LF, vol. III at 15–17, 28, 34).

### f. The Nude Pictures in Hustler

In June of 1978, Hustler became interested in publishing an excerpt from *The Sex Atlas*. Hustler contacted Dr. Haeberle, the author, and learned that The National Sex Forum—now "The Institute for Advanced Study of Human Sexuality"—had assigned all rights to Seabury Press. (Def. Exh. 5). In July, Michael Scott of Hustler submitted to Seabury Press and to Dr. Haeberle a "5000 word excerpt," together with copies of the photographs he wanted to use. (Def. Exh. 7). On July 27, 1978, Ulla Schnell of Seabury Press confirmed by letter that, in exchange for a payment of $600, Hustler had permission to publish the excerpt and the photographs. (Def. Exh. 10; Schnell Dep. at 22, 30–33). By the same letter, Schnell advised Hustler that it should give proper credit to the photographers—Laird Sutton, Coni Beeson, and *Linda Fredrickson.*

In the November 1978 issue (Pl. Exh. 1), the "Preview Page" (p. 126) announced the coming *Sex Atlas* excerpt, "complete with an unusual photo spread," illustrating this Preview with a nude photograph of other children from *The Sex Atlas.* This issue also contained a two-page review of *Meditations on the Gift of Sexuality* (Pl. Exh. 1, pp. 32–33); this review uses six photographs from *Meditations*—five depict scenes of group sex, and the remaining one is the nude picture of the plaintiffs and their mother/next friend taken by Dr. Sutton. (Ct. Exh. 1, p. 61). The photograph was not altered in any way; *neither it nor the review identifies the plaintiffs by name.* The two pages of the review face each other, and they contain nothing besides the pictures from *Meditations* and the written comments about that book.

The plaintiffs first became aware that Hustler had reprinted this photograph when they went to a barbeque at the home of Norman Riffe in Dallas. When Brandon and his mother arrived, Kenny Riffe (age 24) met them at the door, waving a copy of *Hustler* and saying: "You're a star. You're a star. You're in *Hustler* magazine." (LF, vol. I at 119–20; vol. II at 12; BF at 18). Kenny Riffe later made the same comment to Kelly and her father when they arrived. Immediately after that, the parents took the plaintiffs into a private room. After some discussion, Linda Fredrickson said: "What are we going to do?" "This isn't right." (LF, vol. II at 22; KF at 24; BF at 23–24)—and they decided to "get hold of some lawyers."

Linda Fredrickson called an attorney that night. Later, he helped her draft a telegram, which was sent to Hustler on October 25, 1978; it demanded that Hustler not publish any of the nude pictures of the plaintiffs from *The Sex Atlas* in the excerpt to be run in the December 1978 issue (Pl. Exh. 7; LF, vol. II at 22)—and stated that Kelly and Brandon Faloona "have never lawfully given to any person or entity permission to publish the photographs which appear on pages 12, 13, 142 and 154 of *The Sex Atlas* or to publish any similar photographs." [27]

---

**27.** The plaintiffs and their mother/next friend never contacted Seabury Press to complain

about the fact that Seabury gave Hustler permission to use the photographs—nor do they bear

The December 1978 issue of *Hustler* (Pl. Exh. 2) was mailed beginning October 27, 1978—two days after the plaintiffs' telegram—and general distribution of that issue began on November 2, 1978.[28] The "5000 word excerpt" from *The Sex Atlas* (Pl. Exh. 3) is entitled "Children, Sex and Society." It is illustrated with ten pictures from *The Sex Atlas;* one of these is a nude picture of the plaintiffs (*Sex Atlas*, p. 142), one is the photograph made by Linda Fredrickson of the nude genitals of an adolescent male and female (*Sex Atlas*, p. 162), and the remaining pictures are of other children or adolescents. The excerpt begins on page 71 of the December 1978 *Hustler;* [29] the plaintiffs' nude picture is on page 73—and neither it nor the facing page (72) contain anything but the excerpt and other pictures from *The Sex Atlas*.[30] (Pl. Exh. 2, at 72–73). The photograph was not altered in any way, nor are the plaintiffs identified by name, either by the photograph or the written excerpt.

**g. The Alleged Damages**

By this suit, the plaintiff Kelly Faloona seeks $2.5 million in actual damages and $7.5 million in punitive damages; the plaintiff Brandon Faloona also seeks a total of $10 million in actual and punitive damages.[31]

Both plaintiffs claim that the appearance of their nude pictures in *Hustler* "shocked" and "scared" them—and that they were afraid that their friends would see these nude pictures or find out about them, or that someone might confront them with a copy of *these* issues of *Hustler*.[32] (BF at 20, 24, 31–32; KF at 30–34). In particular, Brandon became concerned after a friend who collected "skin magazines" showed him a centerfold from *Hustler*, and Kelly thought that *Hustler* might use her photograph on the cover. (BF at 26–28); KF at 34). The plaintiffs also assert that the publication of their nude photographs in *Hustler* caused them to lose sleep and that their grades have suffered. (LF, vol. II at 27; BF at 24, 34, 42; KF at 29–32). And, Kelly claims that it has damaged her chances of becoming President of the United States because "when you run for anything public, they scrounge around for the worst they can get on you...." (KF at 26; LF, vol. II at 204).[33]

In response, Hustler claims that despite their claims of mental anguish, the plaintiffs never sought psychiatric or medical treatment (BF at 32–33; KF at 28–31), that they completed their school terms with

any ill feelings toward Dr. Laird Sutton for using their photograph to illustrate *Meditations.* (LF, vol. III at 10–11). Linda Fredrickson did call Dr. Haeberle to complain about the nude picture in the November 1978 *Hustler,* but his attitude seemed to be "so what?" (LF, vol. II at 8).

**28.** *Hustler* claims that it did not receive the telegram in time to stop distribution of the December 1978 issue. However, the plaintiffs claim that *Hustler* still has 2,047 copies of this issue available for sale.

**29.** On the facing page (70), there is a non-sexual and non-funny cartoon and the continuation of a supposedly humorous article about necrophelia. (Pl. Exh. 2, at 70–71).

**30.** The *Sex Atlas* excerpt concludes on pages 86 and 122–124 of the December 1978 issue; no other photographs from *The Sex Atlas* are used, although these pages either include or face other *Hustler* cartoons and advertisements. (Pl. Exh. 2).

**31.** Their mother/next friend, Linda Fredrickson, does not seek any damages for the publication of her nude picture in the November 1978 *Hustler.* And, she has no right to recover damages because of the publication of the plaintiffs' nude pictures in *Hustler* because "Texas does not recognize a relational right to privacy or to recover damages for defamation." *Braun,* 726 F.2d at 248, footnote 4.

**32.** The plaintiffs knew what these issues of *Hustler* contained because they were permitted to examine both issues "since their nude pictures were in them." (LF, vol. II at 66–67). They also were permitted to attend all of the depositions in this case and examine all of the exhibits, including the other *Hustler* magazines. (*Id.* at 101).

**33.** Kelly maintains that, while her future presidential hopes could not survive exposure of the fact that her photograph appeared in *Hustler,* it could survive disclosure of the facts that her nude pictures appeared in *The Sex Atlas* and in *Meditations.* (KF at 26).

passing grades (BF at 32, 44–45; but *cf.* LF, vol. II at 27, 40); that they both continued to participate in extracurricular activities (BF at 32–33, 35–41; LF, vol. II at 52–54), and in all respects appear to have led unchanged lives. In addition, Hustler claims that the only person who ever identified the plaintiffs from the nude pictures was a close friend who had not only purchased a *Hustler* magazine, but who had also seen the photographs of the plaintiffs in *The Sex Atlas.* (LF, vol. I at 119–20; KF at 21; but see LF, vol. II at 137, 198–99 where the mother/next friend describes her disgust with "the type of person" who reads *Hustler*). Finally, Hustler claims that, if the plaintiffs have suffered any psychological damage, it is due to other causes (see footnotes 18 and 32)—including the decision of their mother/next friend to expose the private lives of her and the children through this lawsuit.[34]

*Hustler* printed 1.9 million copies of the December 1978 issue; of these, some 1.4 million have been sold (and *Hustler* still has 2,047 copies in its possession for sale). In contrast, through 1980, Seabury Press had distributed 67,250 hardcover and 9,900 paperback copies of *The Sex Atlas*—and a new, expanded version was published in May of 1983. (Def. Exh. 30, 31). However, the mother/next friend testified:

> "It's okay for 70,000 people to look at the pictures of the children in *The Sex Atlas*. It's not okay for one person to look at one picture of my children in *Hustler*." (LF, vol. I at 184)."

### 3. CHOICE OF LAW

Texas has adopted the approach of the Restatement (Second) of Conflict of Laws in a deciding choice of law questions. *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414 (Tex.1984) (contracts); *Gutierrez v. Collins,* 583 S.W.2d 312 (Tex.1979) (Torts). That approach analyzes each separate issue, and applies the state law having the most significant relationship to each issue. This diversity case involves two issues: (i) the right of privacy; and (ii) the validity of the release signed by the mother/next friend on behalf of the minor plaintiffs. Both California and Texas have some interest as to each issue. However, for the following reasons, Texas law—the law of the forum state—should apply to both issues.

### a. The Right of Privacy

With respect to a tort issue, under § 145 of the Restatement the contacts between the parties and the interested states are to be evaluated according to their relative importance to the issue. And, § 153 of the Restatement, which deals specifically with the right of privacy, gives particular weight to the state of the plaintiffs' domicile at the time the injury occurred "if the matter complained of was published in that state."

■ When Hustler published and distributed the November and December 1978 issues, the plaintiffs and both of their parents were domiciled in Texas. Moreover, as discussed above, the plaintiffs have at all times retained close ties to Texas. Therefore, even though the conduct causing the alleged injuries arguably took place in at least three other states—California, where the photographs were taken and where Hustler does business; Ohio, where Hustler is incorporated and has offices; and New York, where Seabury Press granted Hustler permission to use the photographs—the principal injuries, if any, occurred in Texas, where the plaintiffs lived when the two issues of *Hustler* were distributed.

Accordingly, Texas law will be applied to the right of privacy claims. See *Wood v. Hustler Magazine, Inc.,* 736 F.2d 1084 (5th Cir.1984) ("The district court [correctly] determined that the law of Texas, not California, applied" to claims by a Texas resident concerning the invasion of her privacy by Hustler).

---

**34.** Contrary to the arguments of the plaintiffs and the mother/next friend, the attorneys for Hustler would be entitled to cross-examine them about these matters at trial because they are, without question, relevant to the issue of damages.

## b. Validity of the Release.

A parent's power to sign a binding "Photographic Release Form" on behalf of minor children involves aspects of both contract and family law. Therefore, although the place of contracting, the location of the subject matter of the contract, and the reasonable expectations of the parties are to be considered, substantial weight must be given to the domocile of the plaintiffs and their parents. *See* Restatement (Second) of Conflict of Laws, § 188.

In this case, both the plaintiffs and their parents have strong contacts with Texas. Kelly began living in Dallas when she was one year old; Brandon was born here. Although the plaintiffs and their mother/next friend did live in California for a relatively short period, the father remained in Dallas and has lived here continuously since 1967. Moreover, the plaintiffs not only spent summer vacations in Dallas during this period, they actually lived here with their father during the 1975 and 1977 school terms. Indeed, they moved back to Dallas in 1977 before their mother did. These close ties with Texas give this state a very strong interest in governing the relationship between the plaintiffs and their parents. In addition, California no longer has jurisdiction over custody matters since the plaintiffs and both parents now reside in Texas.

■ Of course, the release was executed in California, all parties to the release lived in California at that time, and the mother/next friend had "care, custody, and control" of the plaintiffs pursuant to a final divorce issued by a California court. However, before the mother consented to the nude pictures, she first obtained approval from the father in Texas. Moreover, the release does not restrict use of the photographs to California. Indeed, Dr. Sutton obtained the right to use the photographs in any manner, and they were used in *The Sex Atlas*, which was distributed nationwide. Accordingly, California's interests concerning the validity of the release is not as strong as that of Texas—so Texas law will also govern the release issue.[35]

## 4. VALIDITY OF THE RELEASE

On August 2, 1973, the mother/next friend executed a "Photographic Release Form" covering the nude photographs made of the minor plaintiffs. That release granted all rights in the pictures to Dr. Laird Sutton, the photographer who took them. It also provided that Dr. Sutton was free to use the nude pictures in any way he saw fit—and that he had made "no representations" as to the distribution or use of these pictures. (Def. Exhs. 2, 3). Sutton granted Dr. Erwin Haeberle and The National Sex Forum the right to use the nude pictures of the plaintiffs in *The Sex Atlas* and "in conjunction with the sale and promotion of the book."[36] Dr. Haeberle and The National Sex Forum entered into similar agreements with Seabury Press, which then published—and promoted the sale of—*The Sex Atlas*. (Def. Exhs. 20, 21).

*Hustler* asserts that the release executed by the mother/next friend, Linda Fredrickson, is a complete defense to the plaintiffs' claims that their right of privacy was violated by the publication of the nude pictures of them.[37] In defense, the plaintiffs

35. As discussed below, although neither state has addressed the precise issue presented in this case, the release executed by the mother/next friend on behalf of the plaintiffs is binding regardless of whether Texas or California law is applied.

36. The book review of *Meditations* in the November 1978 *Hustler* and the excerpt and pictures in the December 1978 *Hustler* were designed to promote the distribution and sale of *The Sex Atlas,* in accordance with the agreement

between Sutton, Haeberle and The National Sex Forum. (Def. Exhs. 10, 20, 21).

37. See *Wood v. Hustler Magazine, Inc.,* 736 F.2d at 1089, footnote 1; Restatement (Second) of Torts, § 652F comment b (1976). In the present case, unlike *Wood* and *Braun v. Flynt,* 726 F.2d 245, there is no claim of fraud or wrongdoing in connection with the consent form. Specifically, the mother/next friend, Linda Fredrickson, concedes that Dr. Laird Sutton, a Methodist minister, did not defraud her in any way or

*and* the mother/next friend claim that this release is not valid—because this Court, in a landmark decision, should hold that a "skin" magazine [38] may not publish nude pictures of a minor before it either (i) obtains court approval of a release signed by parents on behalf of the minor, or (ii) makes certain that the parents have obtained a valid judicial order permitting the use of nude pictures of the minor.[39]

### a. Texas Law

This novel contention is baseless. Under Texas law, Hustler was not required to seek court approval for the publication of the nude pictures of the plaintiffs or to ensure that someone else had obtained judicial approval.

Although there are no Texas cases directly on point, § 12.04(7) of the Texas Family Code specifically gives a parent the power to consent to matters of "substantial legal significance concerning the child"— and § 12.04(2) gives the parent the duty of "care, control, protection, moral and religious training, and reasonable discipline of the child." The power to consent to publication of a photograph of a child (whether nude or not) is a matter of "substantial

legal significance," as well as a matter concerning the care, protection and training of the child. Therefore, § 12.04(7) and § 12.04(2) are dispositive of this issue.

Moreover, there is no provision in *any* Texas statute which requires court approval of parental consent under these, or any other, circumstances.[40] Indeed, in § 43.25 of the Texas Penal Code, the legislature addressed a similar issue; there, it provided that parents may not consent to the participation by their children in a "sexual performance" involving actual or simulated sexual intercourse, masturbation, lewd exhibition of the genitals, etc.[41] Had the legislature intended, it could easily have prohibited parents from consenting to the publication of all nude pictures of their children—even those that are not "child pornography" under *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982)—*without court approval*. Of course, it did not.

■■■ This Court will certainly not take it upon itself to usurp the role of the Texas Legislature—*not to mention the responsibilities of parents in raising their children*—by creating such an unwise [42] and

---

trick her into signing the release. See footnote 22.

**38.** The plaintiffs and their mother/next friend do not even attempt to define the term "skin magazine"—although they seem to assume that, whatever a "skin magazine" may be, *Hustler* certainly fits the definition. Evidently, they expect that future courts, when deciding whether a particular book or magazine should have obtained court approval prior to publishing the nude picture of a minor, will simply "know a skin magazine when they see one." See *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793 (1964) (Justice Stewart, concurring).

**39.** Nor do the plaintiffs and their mother/next friend explain how the court approval for publication of nude pictures of minors is to be obtained—whether by an original lawsuit or by some type of ancillary proceeding in the domestic relations court (where the parents are divorced), or in the juvenile or some other court—in the absence of a specific statute creating such a procedure.

**40.** Actually § 43.24(c)(1) of the Texas Penal Code Ann. (Vernon 1974) recognizes a parent's power to consent for a minor under similar circumstances. Under that section, if a minor is accompanied by a consenting parent, a store owner has an absolute defense to a charge of selling obscene material to that minor.

**41.** The federal statute prohibiting "sexual exploitation of children" is 18 U.S.C. § 2252. It also prohibits parents from consenting to "sexually explicit conduct" by their children in photographs, movies, or plays.

**42.** As discussed above, there are many who would—unlike the plaintiffs and their mother/next friend—take great offense to *The Sex Atlas* and to *Meditations*. They would consider these to be trash, nothing but "skin books." See footnotes 5, 11 and 13. And, they could use the same novel argument of required judicial approval to attempt to stop the publication of serious medical or scientific or artistic works which—with the consent of the parents—contain nude pictures of children and adolescents. See *Ferber*, 102 S.Ct. at 3365.

unmanageable [43] requirement as that urged by the plaintiffs and their mother/next friend. Accordingly, the release is valid, and it is a complete defense to the plaintiffs' right of privacy claims. *Wood v. Hustler Magazine, Inc.*, 736 F.2d at 1089, footnote 1; Restatement (Second) of Torts, § 652F comment b (1976).[44]

#### b. California Law

The release executed by the mother/next friend is equally valid under California law. Section 3344 of the California Civil Code, which codifies the common law cause of action for misappropriation of name or likeness, provides:

> "Any person who knowingly uses another's name, photograph, or likeness ... without such person's prior consent, *or in the case of a minor, the consent of his parent of legal guardian,* shall be

liable for any damages sustained by the person or persons injured as a result thereof ..."

■ This section obviously recognizes the validity of parental consent, and it contains no exception for pictures of minors which appear in "skin magazines."[45] Although the statute may apply only to "commercial appropriation" claims, it would be ludicrous for California common law— which § 3344 partially codifies—to provide that parental consent is a defense to one type of "right of privacy" claim and not the others. Therefore, in the absence of any California cases directly in point, it is logical to assume that parental consent also bars a common law claim for invasion of privacy by "publication of private facts" or by "placing the plaintiffs in a false light."[46]

---

**43.** If parental consent to the publication of photographs is not valid under § 12.04(2) and (7)—and can be disaffirmed, as the plaintiffs claim—then the courts can "eagerly" await litigation by minors seeking damages, despite parental consent, for such things as injuries sustained on school trips or in extracurricular activities, alleged damages from publication of photographs in newspapers or on television, etc.

**44.** In the alternative, the plaintiffs and their mother/next friend assert that the release is void as an illegal contract because it permitted the publication of "child pornography"—i.e., the nude pictures of the plaintiffs—in *Hustler.* This is also baseless. The nude pictures of the plaintiffs are not "child pornography" because they do not show the plaintiffs engaged in any sexual acts. *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113; *Hunt v. State,* 475 S.W.2d 935 (Tex.Crim.App.1972). The nude photographs of the plaintiffs—admired, and admittedly not obscene, when published in *The Sex Atlas*—did not become "child pornography" when they appeared in *Hustler.*

**45.** California does have a statute which requires court approval of employment contracts for child actors and models. *See* Cal.Civ.Code § 36. However, that provision was enacted for the protection of the employer to prevent a minor from disaffirming a contract. Accordingly, it is inapplicable here. *See Morgan v. Morgan,* 220 Cal.App.2d 665, 34 Cal.Rptr. 82 (Cal.App.1963).

**46.** New York law also specifically provides that parental consent is a defense to a minor's claim of invasion of privacy. New York Civil Rights

Law, §§ 50–51. In a case virtually identical to this one—*Shields v. Gross,* 58 N.Y.2d 338, 461 N.Y.S.2d 254, 448 N.E.2d 108 (1983)—the Court of Appeals of New York considered the narrow issue of the validity of a photographic release for nude photographs of the minor signed by the parent on the minor's behalf. Noting that the plaintiff, *Brooke Shields,* had allowed her nude photographs to be widely distributed—including publications by *Playboy* and *Penthouse* —the court held that the mother's release was valid, stating:

> "... Nor do we think court approval necessary under the circumstances existing in the normal child model's career. Given the nature of the employment, *it is entirely reasonable for the Legislature to substitute the parents' judgment and approval of what is best for their child for that of a court.*

> "Finally, it is claimed that the application of the statute as we interpret it may result in unanticipated and untoward consequences. If that be so, there is an obvious remedy. *A parent who wishes to limit the publicity and exposure of her child need only limit the use authorized in the consent,* for a defendant's immunity from a claim for invasion of privacy is no broader than the consent executed to him ..." (461 N.Y.S.2d at 258, 448 N.E.2d at 112).

In the present case, the mother/next friend, Linda Fredrickson, did not limit the use of the plaintiffs' nude pictures in the release given to Dr. Laird Sutton; in contrast, she did specifically limit the use of the nude photographs that she took of a minor. See footnote 24; Def. Exh. 4; (LF, vol. I at 130–31).

## 5. THE RIGHT OF PRIVACY CLAIMS

In addition to the fact that the release affords a complete defense to Hustler, the right of privacy claims made by the plaintiffs and their mother/next friend are baseless.

### a. The "False Light" Contentions

The plaintiffs claim that the publication of their nude pictures in the two issues of *Hustler* placed them in a false light by intimating that they approved of and participated in the acts and lifestyle depicted throughout *Hustler*. Under Texas law:

> "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> > (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
> >
> > (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."

Restatement (Second) of Torts § 652(e) (1977); *Braun v. Flynt,* 726 F.2d 245, 252 (5th Cir.1984).

However, under Texas law, "the court must make a threshold determination of whether the complained of publication is capable of conveying defamatory or false

meaning." *Braun,* 726 F.2d at 253; *Golden Bear Distribution Sys. v. Chase Revel, Inc.,* 708 F.2d 944 (5th Cir.1983). Contrary to the plaintiffs' arguments, *Braun* does not hold that—merely because they object to the "obscene, nude, profane, lurid and pornographic" contents of *Hustler*—the publication of their nude pictures in *Hustler* automatically placed the plaintiffs in a false light. Indeed, *Braun* is not only distinguishable from this case,[47] it illustrates why the "complained-of publication" of the plaintiffs' nude pictures in *Hustler* is not capable of conveying "derogatory or false meaning."

### (i) the proper context

*Braun,* of course, states that the entire *Chic* magazine should be introduced into evidence "so that the jury could, in effect, be placed in the position of the ordinary reader." (726 F.2d at 253–54). The *Braun* panel rejected the rather absurd contention that "we should cut out Mrs. Braun's picture and look solely at it" to determine whether she had been placed in a false light—because "common sense dictates that the context and manner in which ... a picture appears determines to a large extent the effect which it will have" on an ordinary reader. (726 F.2d at 254).

However, the Fifth Circuit *did not* hold that Mrs. Braun was placed in a false light merely because she objected to the contents of *Chic*,[48] a "glossy, oversized, hard-

---

**47.** In addition to the differences discussed below, *Chic*—the companion magazine to *Hustler*—fraudulently obtained the "consent" for the publication of the picture of Mrs. Braun and her novelty act with "Ralph the Diving Pig." *Braun v. Flynt,* 726 F.2d at 247–48. However, in this case, the mother/next friend, Linda Fredrickson, does not contend that Dr. Laird Sutton—the photographer, a Methodist minister, and her friend and co-worker at *The National Sex Forum*—defrauded her in any way or tricked her into signing the release. Accordingly, the plaintiffs do not object to the publication of their nude pictures in *The Sex Atlas* or in *Meditations* pursuant to this release. See footnotes 22, 25, 27.

**48.** If the *Braun* panel had intended to hold this, it would have been obligated to distinguish—or to disapprove—numerous cases which hold that

there is no right of privacy action merely because a person's photograph or name appears in a magazine whose content is objectionable to that person. See, e.g., *Ann-Margret v. High Society Magazine, Inc.,* 498 F.Supp. 401 (S.D.N.Y. 1980); *Faucheux v. Magazine Management,* 5 Media L.Rptr. 1697 (E.D.La.1979); *Falwell v. Penthouse International, Ltd,* 521 F.Supp. 1204 (W.D.Va.1981); *Handelman v. Hustler Magazine,* 469 F.Supp. 1053 (S.D.N.Y.1979); *Goelet v. Confidential, Inc.,* 5 A.D.2d 226, 171 N.Y.S.2d 223 (1958). As stated in *Handelman:*

> "But magazines with sexually explicit text and photographs of genitalia are part of our contemporary scene. Successful candidates for the presidency of the United States consent to interviews in magazines of the same genre as *Hustler*. We think that Plaintiff is not entitled to damages merely because there is an oblique reference to him in a magazine

core men's magazine." (726 F.2d at 247). Instead, the court took pains to describe the actual context in which Mrs. Braun's picture appeared in the "Chic Thrills" section at the beginning of the issue in question:

> "*On the same page* on which Mrs. Braun's picture appeared were stories about '10 Things That P\_ \_ \_ Off Women' with an accompanying cartoon of a woman whose large breasts are partially exposed; a story entitled 'Mammaries Are Made of This' about men whose breasts have been enlarged by exposure to a synthetic hormone, with an accompanying cartoon showing a man with large breasts; and a story entitled 'Chinese Organ Grinder' about the use of sexual organs from deer, dogs and seals as a chinese elixir. *On the facing page* is a picture showing a nude female model demonstrating navel jewelry and an article on 'Lust Rock Rules' about a 'throbbing paean' to sex written by 'the Roman Polanski of rock.' *The cover* of the issue shows a young woman sitting in a chair with her shirt open so as partially to reveal her breasts, one hand to her mouth and the other hand in her tightly-fitting, unzipped pants." (726 F.2d at 248) (emphasis added).

The *Braun* opinion also noted that, of the twenty-one vignettes included in the "Chic Thrills" section, most of these "either concerned sex overtly or were accompanied by a photograph or cartoon of an overtly sexual nature"—and concluded "*this is the context in which Mrs. Braun's picture was published.*" (726 F.2d at 247).

In contrast to *Braun*, the nude pictures of the plaintiffs in *Hustler* appear—not in a section devoted to photographs or cartoons "of an overtly sexual nature" [49]—but

in a legitimate *book review* and in a long *excerpt* from a serious educational text on sexuality. In particular:

(i) In the November 1978 *Hustler*, the plaintiffs' picture is part of a two-page book review of *Meditations on the Gift of Sexuality*. The two pages face each other, and they contain nothing but nude pictures from *Meditations* and the reviewer's comments about that book.

(ii) In the December 1978 *Hustler*, the plaintiffs' picture is part of a 5000-word excerpt from *The Sex Atlas*. The excerpt begins on page 71 and continues on two facing pages (72 and 73). The nude picture of the plaintiffs is on one of these two facing pages (73)—and they contain nothing but nude pictures of children and adolescents from *The Sex Atlas* and the discussion taken from that book.[50]

Therefore, although there is certainly other material in the two *Hustler* issues which is sexually explicit and offensive (see footnotes 5, 10, 11 and 13), the specific context in which the nude pictures of the plaintiffs appear is the very same context in which these identical pictures appeared in *The Sex Atlas* and *Meditations*.

### (ii) the false light claims

In *Braun*, the picture which *Chic* had fraudulently obtained—and which depicted the novelty act that Mrs. Braun performed with "Ralph, The Diving Pig" at Aquarena Springs, a family amusement park—was published in the context of the "Chic Thrills" section and its numerous photographs and cartoons "of an overtly sexual nature." (726 F.2d at 247). Therefore, as the Fifth Circuit held (and as the jury found), the "complained-of" publication

---

which he believes to be in bad taste." (469 F.Supp. at 1060)."

**49.** Like the "Chic Thrills" section described in *Braun* (726 F.2d at 247–248), or the monthly "Beaver Hunt" section of *Hustler* described in *Wood v. Hustler Magazine,* 736 F.2d at 1086, 1089, 1092.

**50.** As discussed above, on the page (70) facing the beginning page (71) of *The Sex Atlas* ex-

cerpt, there is a non-sexual cartoon and part of a supposedly humorous article about necrophelia. And, *The Sex Atlas* excerpt continues on pages 86 and 122–24 of the December 1978 *Hustler,* but these pages do not contain sexual photographs or cartoons like the "Chic Thrills" section of *Chic* or the "Beaver Hunt" section of *Hustler. Braun,* 726 F.2d at 247, 248; *Wood,* 736 F.2d at 1086.

was capable of conveying "derogatory or false meaning" because:

(i) the ordinary reader could form an unfavorable opinion about the character of Mrs. Braun (i.e., that she was unchaste or promiscuous); or

(ii) the ordinary reader could assume that Mrs. Braun approved the opinions expressed in *Chic* or that she had consented to the publication of her picture in ·*Chic*. (726 F.2d at 254, footnote 11).[51]

However, this is not true with respect to the nude pictures of the plaintiffs in *Hustler*. Since these photographs were simply part of the book review of *Meditations* and the excerpt from *The Sex Atlas*, no ordinary reader could *reasonably* assume:

(i) that these five and seven year old children were unchaste or promiscuous, or had unfavorable character, merely because their nude pictures appeared in two serious scientific texts about sexuality;

(ii) that children of this age approved, or even knew about, the sexual acts and lifestyle depicted throughout *Hustler* merely because they were in legitimate books reviewed and excerpted in *Hustler;* or

(iii) that these minors, instead of their parents, consented to the publication of their nude pictures in *Hustler* or, for that matter, in *Meditations* and *The Sex Atlas*.[52]

Indeed, one who read the book review and the *Sex Atlas* excerpt could, at most, form an unfavorable opinion *about the parent* who consented to the publication of the nude pictures of her children—either because she approved the use of the pictures in *The Sex Atlas* and *Meditations* (see footnotes 13, 26), or because she might approve the contents of *Hustler*, or because she failed to guard against the publication of her children's pictures in a magazine like *Hustler*.[53] However, the mother/next friend does not seek any damages on her behalf, and she cannot recover damages for the plaintiffs because "Texas does not recognize a relational or derivative right of privacy." *Wood v. Hustler Magazine*, 736 F.2d at 1087.

■■■ Therefore, the publication of the plaintiffs' nude pictures in *Hustler*, in the context of the book review of *Meditations* and *The Sex Atlas* excerpt, is not capable of conveying "derogatory or false meaning" about the plaintiffs. Accordingly, their "false light" claims are baseless.[54]

### b. The Claimed Disclosure of Private Facts

The plaintiffs also contend that the publication of their pictures in *Hustler* invaded

---

**51.** Similarly, in *Wood,* the Fifth Circuit held that "Hustler's publication falsely represented that LaJuan consented to the submission and publication" of her nude photograph in the "Beaver Hunt" section, and that the caption under the picture "falsely attributed a lewd fantasy to LaJuan." (736 F.2d at 1086, 1089).

**52.** See, for example, *O'Brien v. Pabst Sales Co.,* 124 F.2d 167, 169–70 (5th Cir.1942) (All-American football player not placed in a false light because of his picture on the 1939 Pabst Beer calendar because "there was no representation or suggestion of any kind" that O'Brien was a beer drinker or was endorsing Pabst).

**53.** Actually, the mother/next friend, Linda Fredrickson, was in the nude picture which appeared in the November 1978 *Hustler*. And, she was given credit in the December 1978 *Hustler* (p. 7) for her nude photographs of two adolescents which appeared in *The Sex Atlas* excerpt in the December 1978 *Hustler*.

**54.** *Public Figures:* Hustler claims that, because the plaintiffs' nude pictures appeared in *The Sex Atlas* and *Meditations,* they are "public figures" for purposes of its first amendment protection under *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). This is not correct. The limited public exposure "does not suffice to expose [the plaintiffs] to the increased burdens and lessened protections of those who fall within the *Gertz* standard." *Braun v. Flynt,* 726 F.2d at 249–50.

*Newsworthy Event:* Hustler also claims that the accurate reporting of a newsworthy event cannot constitute an invasion of privacy. *Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1976). Although this is correct, there is a fact question under the present summary judgment record as to whether the review of *Meditations* in the November 1978 *Hustler* and *The Sex Atlas* excerpt in the December 1978 *Hustler* were accurate "reporting" of "newsworthy events." See *Diaz v. Oakland Tribune,* 139 Cal.App.3d 118, 188 Cal.Rptr. 762 (1983); Def. Exhs. 12–15, 25–28.

their right to privacy by disclosing the highly private facts of their nude appearance. Under Texas law:

> "One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that
>
> > (a) would be highly offensive to a reasonable person, and
> >
> > (b) is not of legitimate concern to the public."

Restatement (Second) of Torts § 652(d); *Wood v. Hustler Magazine*, 736 F.2d at 1089.

■ However, this applies only to *private* facts. There is no "liability when the defendant merely gives further publicity to information about the plaintiff which is already public" or where the publicity involves matters that "the plaintiff himself leaves open to the public eye." Restatement (Second) of Torts § 652D, comment c; *Virgil v. Time, Inc.*, 527 F.2d 1122, 1125 (9th Cir.1975), *cert. denied*, 425 U.S. 998, 96 S.Ct. 2215, 48 L.Ed.2d 823 (1976); *Wood*, 736 F.2d at 1089, footnote 1; *cf. Vitale v. National Lampoon, Inc.*, 449 F.Supp. 442, 445 (E.D.Pa.1978).

■ In this case the plaintiffs—with the consent and participation of their mother/next friend—voluntarily posed for nude pictures which were to be published. They cannot seriously claim now that these

nude photographs are part of their "highly private life."[55] Indeed, these very pictures first appeared in *The Sex Atlas* and in *Meditations*. At least 67,250 hardcover and 9,900 paperback copies of the *Sex Atlas* have been sold and distributed to the public. Therefore, unlike the wife in *Wood v. Hustler*, the fact of the plaintiffs' nude appearance is no longer "a highly private fact." Instead, the nude pictures of the plaintiffs—showing their appearances when they were seven and five—may be viewed today in bookstores or libraries by anyone so inclined.

Moreover, unlike the couple in *Wood*,[56] the plaintiffs have never attempted to hide their nude photographs from their family and friends. At one time, both parents proudly displayed one of the nude pictures of the plaintiffs and their mother/next friend. And, *The Sex Atlas* was openly displayed in their living room, and the plaintiffs routinely showed their nude pictures in it to friends visiting in the home.

Therefore, the claims based upon the disclosure of "the highly private fact of the plaintiffs' nude appearance" are totally without merit.[57]

### c. The "Commercial Appropriation" Claims

The plaintiffs contend that *Hustler*, by publishing their nude pictures in the November and December 1978 issues, misap-

---

**55.** In *Wood v. Hustler Magazine*, the husband and wife took several photos of each other in the nude in "a wilderness area"; but they "treated the photographs as private material, not showing them to anyone else and keeping them out of view in a drawer in their bedroom." The nude pictures of the wife, LaJuan, became public only when they were stolen by a neighbor and fraudulently submitted to *Hustler* for publication in its "Beaver Hunt" section. (736 F.2d at 1085).

**56.** And unlike the convicted hijacker in *Briscoe v. Reader's Digest Association*, 4 Cal.3d 529, 93 Cal.Rptr. 866, 483 P.2d 34 (Cal.1971), who took pains to hide his criminal record from his family and friends, and who was successful for years.

**57.** *Identification of Plaintiffs:* Hustler claims that the plaintiffs—who are now ten years older than they were when the nude pictures were

made—have no right of privacy actions for either "public disclosure" or for "false light" because (i) they were not named or identified in *Hustler*, and (ii) they cannot be identified from those nude photographs. However, the plaintiff in *Braun* recovered for the invasion of her privacy even though she was not identified by name in the "Chic Thrills" section. (726 F.2d at 247–48). Moreover, the summary judgment record contains no other photographs of the plaintiffs showing how they appear now (or did appear at other relevant times). Consequently, there is a fact question as to whether the plaintiffs can be recognized from the nude pictures in *Hustler* for purposes of their "false light" and "public disclosure" claims. *Motschenbacher v. R.J. Reynolds Tobacco Co.*, 498 F.2d 821, 826–27 (9th Cir.1974).

propriated their likeness for its own commercial advantage. Under Texas law:

"One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of privacy."

Restatement (Second) of Torts § 652C; *Kimbrough v. Coca-Cola/USA*, 521 S.W.2d 719 (Tex.Civ.App.—Eastland 1975).

■ However, mere publication of a person's likeness in a commercial newspaper or magazine does not create a cause of action for misappropriation. Restatement (Second) of Torts § 652C, comment d; *Ann-Margret v. High Society Magazine*, 498 F.Supp. 401, 406 (S.D.N.Y.1980). The public must be able to identify the person from the photograph or drawing—and the defendant must have capitalized upon the likeness of that person in order to sell more magazines or newspapers. *National Bank of Commerce v. Shaklee Corp.*, 503 F.Supp. 533, 540 (W.D.Tex.1980) ("Hints from Heloise"); *Falwell v. Penthouse International, Ltd.*, 521 F.Supp. 1204, 1210 (W.D.Va.1981).

■ In this case, the use of the plaintiffs' nude photographs in *Hustler* does not meet either requirement for liability. The two *Hustler* issues did not identify the plaintiffs in any manner. There were no captions under the photographs, and neither the book review of *Meditations* nor the *Sex Atlas* excerpt referred to the plaintiffs, by name or otherwise. Moreover, Hustler did not exploit the photographs in a publicity campaign designed to sell more magazines. Indeed, the "preview" in the November 1978 issue for the coming excerpt from *The Sex Atlas* uses a nude picture of other children, not the plaintiffs.

Accordingly, the plaintiffs' claims of commercial appropriation are baseless.

## 7. CONCLUSIONS

The plaintiffs are, quite understandably, disgusted and upset by the publication of their nude pictures in *Hustler*. That magazine is tasteless, it is offensive, and it is filled with unmitigated raunch. Nevertheless, *Hustler* is protected by the First Amendment because it is not "obscenity." *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).[58] And, the nude pictures of the plaintiffs are not "child pornography" whether they appear in *The Sex Atlas* or in *Hustler*. *Ferber*, 102 S.Ct. at 3358, 3365.

This Court will not—and, indeed, should not—substitute its judgment for that of the mother/next friend, Linda Fredrickson, in raising her children. She could have refused to permit anyone to make nude pictures of the plaintiffs, she did not. She could have limited the publication of those nude pictures, but she did not. These were decisions, like so many involved in parenthood, that she determined were in the best interests of her children. Her conduct was certainly not criminal (see footnote 14)—and, without question, it did not require judicial approval by any court.

No fraud or other wrongdoing was involved when the mother/next friend executed the release covering the nude pictures of the plaintiffs. Therefore, the release is a complete defense to the plaintiffs' claims that their right of privacy was violated by the publication of the nude pictures in *Hustler*. Moreover, irrespective of the release, the right of privacy claims are baseless—because the plaintiffs were not placed in a false light by the book review or the excerpt, there was no public disclosure of private facts, and *Hustler* did not misappropriate their pictures for commercial advantage.

Although they are seeking damages by this suit, what the plaintiffs and their mother/next friend actually want is *censorship:* they intensely dislike *Hustler* and believe that it should not exist. (LF, vol. I at 141–42; Pl. Exh. 12). Granted, if only

---

**58.** "Only small men are afraid of small writings." (*Pierre de Beaumarchais*). "Although the defendant may be the worst of men ... the rights of the best of men are secure only as the rights of the vilest and most abhorrent are protected." Judge Cuthbert Pound, dissenting in *People v. Gitlow*, 234 N.Y. 132, 136 N.E. 317, 327 (1922).

matters of taste were involved, the plaintiffs would be right. However, the constitutional protections of the First Amendment—freedom of speech and of press—block these censorship efforts, as indeed they should. For if one succeeds in censoring *Hustler*, then another will most certainly attack *The Sex Atlas, Mediations,* or other scientific, medical, artistic, or literary works, because they contain pictures of nude children (See footnotes 5, 11 and 13).[59] And, the plaintiffs may not accomplish their desired censorship by disguising their efforts in traditional "right to privacy" claims or in novel requests for judicial control of "skin magazines."

Censorship, "like charity, should begin at home; but unlike charity, it should end there."[60] Accordingly, this case is DISMISSED.

---

**59.** Those who would be our censors are certainly not lacking either in imagination or desire. Indeed, in the "interests of our children," censors have banned *Donald Duck* and *Tarzan* comic strips from libraries in Helsinki and in Downey, California (because of the "suspect relationships" which both have had for years with females to whom they are not married) ... they have banned *Snow White* as a school play in Chicago (because of the "racist" overtones of this fairy tale) ... they have attacked comic books because of such things as the "psychological homosexual relationships" between such leotard-attired super heroes as *Batman* and his young ward, *Robin* ... and they have attempted to keep J.D. Salinger's infamous *"Catcher In the Rye"* out of our schools. See Perrin, *Dr. Bowdler's Legacy* (A History of Expurgated Books) (Atheneum 1969); and *Poisoned Paradise: the Underside of Winnie-the-Pooh,"* in *The Pooh Perplex* by Frederick C. Crews (E.P. Dutton & Co. 1963).

**60.** Clare Boothe Luce.